**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MEDIDATA SOLUTIONS, INC., and MDSOL EUROPE LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> VEEVA SYSTEMS INC., <br><br><br> Defendant. | Civil Action No. 1:17-cv-00589 <br><br> **DEMAND FOR JURY TRIAL** |

## SECOND AMENDED COMPLAINT

Plaintiffs Medidata Solutions, Inc. and MDSOL Europe Limited (collectively, "Medidata"), by and through its undersigned counsel, alleges for its Complaint against Defendant Veeva Systems Inc. ("Veeva") as follows:

## NATURE OF THE ACTION

1.     This action arises out of Veeva's willful and deliberate theft of Medidata's valuable trade secrets, including but not limited to confidential and proprietary information relating to the development, marketing and sale of Medidata's industry-leading technology solutions and services for clinical research and trials.  Upon information and belief, Veeva obtained Medidata's trade secrets and confidential information by deliberately targeting Medidata's employees and inducing them to violate their contractual and other obligations to Medidata, rather than competing fairly with Medidata on a level playing field.

2.     Medidata offers its life science clients sophisticated clinical trial software-as-a-service ("SaaS") solutions that allow them to seamlessly manage all stages of clinical trials at multiple sites around the world.  Like its customers, Medidata is driven by the desire to improve patient outcomes.  Since its founding in 1999, Medidata has been committed to ongoing innovation, using a unique activity-driven design approach that Medidata developed to improve

clinical trials and thus help its customers get critical treatments to market—and to individual patients—more quickly.  As a company built on innovation, deep and broad knowledge of the industry, and cutting-edge software solutions, Medidata safeguards its trade secrets and confidential information, which include, but are not limited to, technical know-how used to develop Medidata's software, as well as information regarding software architecture; platform integration; customer usage and expectations; pricing; industry competitive intelligence; clinical trial management tools (including without limitation study design, start-up, strategic monitoring, and analytics); activity-driven design; and short- and long-term business strategies concerning marketing, sales, research and technology initiatives, product roadmaps, go-to-market strategies, and geographic/customer expansion pipelines and opportunities.

3.     Upon information and belief, Veeva realized that it lacked the knowledge, insight, and vision to independently develop a successful integrated electronic data capture ("EDC") and clinical trial management software ("CTMS") platform using its own resources.  Upon information and belief, Veeva schemed to address that deficiency and accelerate its product development and marketing efforts by misappropriating those critical assets from Medidata.

4.     Upon information and belief, Veeva has induced Medidata's employees, including Alan Mateo ("Mateo"), Michelle Marlborough ("Marlborough"), Sondra Pepe ("Pepe"), Jason Rizzo ("Rizzo") and Richard Young ("Young") (collectively, the "Former Employees"), to disclose to Veeva highly confidential and competitively valuable information that they obtained from Medidata, in violation of the Confidentiality, Invention Assignment and Non-Competition Agreement ("Confidentiality and Non-Compete Agreement") that each of Medidata's employees, including the Former Employees, executed as a condition of and in consideration for employment with Medidata.  True and correct copies of the Confidentiality and Non-Compete Agreements executed by the Former Employees are attached hereto as Exhibits A–E.

5.     Veeva has brazenly declared that it "will not let a current or past non-compete agreement prevent [Veeva] from hiring a qualified candidate" and has promised prospective employees that it "will defend you against attempts to enforce your existing non-compete."

6.     Upon information and belief, consistent with Veeva's admitted policy of disrespecting non-compete covenants, it targeted the Former Employees and other Medidata employees in order to gain access to critically sensitive trade secret and confidential information regarding Medidata's products, customers, and business strategy.  Upon information and belief, Veeva was assisted in building a team with comprehensive knowledge of Medidata's systems and customer relationships by Mateo, Medidata's former Executive Vice President of Field Operations. In violation of his non-compete agreement with Medidata, Mateo, among other things, actively identified and recruited former Medidata employees who have helped Veeva access, and benefit from, Medidata's confidential information.  Legitimate hiring in the open market, without the benefit of Mateo's insider knowledge as to which of Medidata's employees would be most likely to have confidential information that could be used in developing and marketing competing products, would not have resulted in such targeted recruitment and hiring of highly knowledgeable senior employees from a single company such as Medidata.

7.     Indeed, several Medidata employees who later joined Veeva, including at least three of the Former Employees—Mateo, Marlborough, and Rizzo—took with them, in violation of their contractual obligations and fiduciary duties, copies of highly confidential internal Medidata documents, including but not limited to materials labelled "Proprietary and Confidential" setting forth detailed information about (a) actual and projected revenue by product, customer, and sales representative; (b) customer contract renewal schedules; (c) pricing formulae; (d) sales performance by customer and by sales representative; (e) sales targets; (f) customers' product usage and needs; (g) product development activity and plans; and (h) go-to-market

strategies, all of which would be of enormous competitive value to a competitor seeking to enter the market and compete with Medidata.

8.      Furthermore, at the time of their departure from Medidata, at least three of the Former Employees—Marlborough, Rizzo and Young—deliberately misled Medidata as to their future plans.  In particular, Young falsely stated that he would not be joining Veeva, Rizzo claimed that he wanted to do something different with his career but in fact reappeared at Veeva several months later in an analogous role to the one he had at Medidata, and Marlborough assured Medidata that she would not be working in a competitive role at Veeva, when in fact that is precisely what she did.

9.      Upon information and belief, once Veeva hired the Former Employees, each of whom was subject to an express non-competition agreement at the time of their hiring, it induced each of them, in violation of their express contractual obligations, to disclose trade secrets and other confidential information that they acquired during their employment with Medidata and retained after leaving Medidata, and to directly compete with Medidata.

10.     Upon information and belief, in furtherance of its plan to use Medidata's trade secrets and confidential information to leapfrog into the market, on June 22, 2016, Veeva announced its first CTMS offering, Veeva Vault CTMS, which was released in the first quarter of 2017.  Then, on October 13, 2016, Veeva announced its first EDC offering, Veeva Vault EDC, which was released on April 25, 2017.  Overall, Veeva's announcements indicated that its forthcoming products would include specific features and functionalities that had been the focus of highly confidential strategy discussions at Medidata, particularly in-progress and forthcoming research and technology initiatives.  Upon information and belief, those same product features and functionalities were in fact included in the product offerings that Veeva launched in early 2017. The similarities between the features and functionalities of Veeva's new product offerings and

those of Medidata's existing products, coupled with the Former Employees' extensive involvement in Medidata's competitive product development, are too numerous and precise to be mere coincidence. Upon information and belief, they are not a coincidence, but rather the result of a deliberate plan on the part of Veeva, facilitated by the Former Employees.

11.    Tellingly, none other than Marlborough, who was Vice President of Product Strategy for Medidata, delivered a presentation at Veeva's October 2016 Global R&D Summit that Veeva titled "Introducing Veeva Vault CTMS: Unifying Clinical Information, Documentation and Process." The presentation, which involved the very same technology that Marlborough had closely shepherded while at Medidata, establishes that Marlborough violated her confidentiality and non-compete obligations to Medidata by assisting Veeva in developing a directly competing product. Medidata subsequently discovered that shortly before Marlborough's departure from Medidata, she took steps, seemingly unrelated to any Medidata-specific business purpose, to access documents containing trade secrets and competitively valuable information, including information about the development of Medidata's software platform, and sent them to her personal e-mail account, in violation of Medidata's policies. The extent of Marlborough's violation of her confidentiality obligations became even clearer once Marlborough, along with other Former Employees, admitted retaining thousands of proprietary and confidential documents long after departing Medidata.

12.    Following Veeva's product announcements, Medidata representatives began fielding questions from investors, analysts, clients, prospective clients, and partners about Medidata's product offerings that demonstrated a detailed knowledge of the products' design and functionality that *only* Medidata employees with intimate knowledge of those products would have had. When Medidata's representatives asked where these questions were coming from, they were told that Veeva had suggested that these specific questions be asked. Upon information and belief,

Veeva obtained the intimate knowledge of Medidata's products that informed those questions from the Former Employees, who revealed to Veeva specific, detailed confidential information in violation of their contractual and fiduciary obligations to Medidata.

13.     Upon information and belief, Veeva's actions with respect to Medidata and its valuable trade secrets are part of a broader pattern and practice, whereby Veeva has sought to build its business not on its own innovation and creativity but rather on trade secrets that it misappropriates from others.  Indeed, court filings reflect that at least two other companies have filed lawsuits claiming that Veeva used their valuable trade secrets and confidential information to create competing products.  In January 2017, one of Veeva's direct competitors, Quintiles IMS, sued Veeva for misappropriating confidential information in order to "gain insight into the proprietary features and accuracy of [competitive offerings] in order to aggressively tailor [Veeva's] own sales and marketing tactics."

14.     In light of these anticompetitive actions by Veeva, Medidata has been left with no choice but to bring this action to prevent Veeva from unfairly benefitting from Medidata's investment over more than a decade in developing its highly regarded, successful platform to conduct and manage clinical research and trials as well as other related products and services.

15.     Through this lawsuit, Medidata seeks injunctive relief and recovery of damages that it has suffered as a result of: (1) Veeva's misappropriation of Medidata's trade secrets, under both the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(1), and New York law; (2) Veeva's tortious interference with Medidata's contractual relations with its employees and former employees; (3) Veeva's aiding and abetting the breaches of their fiduciary duties by Medidata's employees and former employees, including the Former Employees; (4) Veeva's acts of unfair competition; and (5) Veeva's unjust enrichment at Medidata's expense.  Unless Veeva's actions are halted, Medidata will suffer irreparable damage, and Veeva's improper actions will encourage

other companies to violate the rights of true innovators without themselves investing in the research and development necessary to innovate independently.

## THE PARTIES

16.     Plaintiff Medidata Solutions, Inc. is a Delaware corporation with its principal place of business at 350 Hudson Street, New York, New York 10014.

17.     Plaintiff MDSOL Europe Limited is an English corporation with its registered office at 5 New Street Square, London EC4A 3TW.

18.     Upon information and belief, Defendant Veeva is a Delaware corporation with its principal place of business at 4637 Chabot Drive, Suite 210, Pleasanton, California 94588.  Upon information and belief, Veeva is registered to do business, and in fact conducts business, in the State of New York.

## JURISDICTION AND VENUE

19.     This action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, as amended, and New York law.  This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has supplemental or pendent jurisdiction over Medidata's remaining claims under 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Veeva.  Upon information and belief, Veeva has, and continues to have, continuous and systematic business contacts with the State of New York, as it is registered to do business in the State of New York, has an office located in New York City, publicly advertises employment openings located in New York, and directly, and through agents, representatives, subsidiaries or intermediaries, has conducted and continues to conduct business extensively in and through New York.  Upon information and belief, Veeva has purposely availed itself of the benefits and protections of the State of New York by marketing, selling, and providing goods and services to residents in this district.

21.     Venue is proper in this District under 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### *Medidata Has Been a Pioneer in the Field of*
### *Clinical Trial Technology since the Company's Inception*

22.     Founded in 1999, Medidata is a global SaaS company that works with the medical, pharmaceutical, and biotechnology research industry to make clinical trials better.  Medidata focuses on providing innovative products and services to help its customers run better clinical trials, thereby ensuring that new treatments and therapies are made available quickly and safely to the patients who need them.

23.     Using a unique activity-driven design approach that it developed over the course of many years, Medidata provides, among other things, cloud-based technology and related services that allow its life science customers to accurately and efficiently design clinical trials; manage and monitor on-going trial activities; develop and administer trial budgets; manage trial-related payments; capture, manage and report clinical trial data; plan and execute randomized subject allocation methodologies; manage clinical trial supplies; and view, track, and evaluate trial progress by applying analytic tools to trial data.  Medidata maintains a competitive advantage due to its proprietary algorithms and advanced clinical data analytics tools, including Centralized Statistical Analytics ("CSA"), which is designed to identify unusual clinical trial data and key risk indicators.

24.     At the time of Medidata's inception, and well into the 2000s, the pharmaceutical industry was wary of adopting SaaS, in part due to concerns over the security of externally hosted servers on which sensitive data, proprietary and confidential information, and intellectual property would reside.  Instead, companies developed custom software solutions internally or purchased pre-packaged, limited-purpose software from a third-party vendor for in-house use.  Each of these alternatives was inefficient: development of a custom solution was difficult, costly, and time-

consuming, third-party solutions were inflexible and often took months or even years to set up and prepare for use, and with both custom and third-party software, interoperability was impractical and costly.

25.     Medidata saw the potential of SaaS and committed to it as a business model.  SaaS offers numerous benefits, such as the ability to quickly and efficiently share information throughout large-scale organizations as well as with outsourced parties and partners, decrease internal IT costs, rapidly change and update technology configurations, and increase compliance with international, federal and state regulators.  The latter is particularly important in the medical and pharmaceutical industries, which are subject to high levels of government scrutiny and must respond to frequently changing laws and regulations.

26.     Medidata's first software offering, released in 1999, was a SaaS EDC system for use by physician site investigators and company researchers for clinical trials.  Put simply, EDC systems collect clinical trial data in electronic form as opposed to paper form.  Medidata's EDC system was the industry's first thin-client and web-based system that was browser- and operating system-independent.

27.     Over the next few years, Medidata significantly expanded its software with additional tools for effectively running clinical trials, such as web-based administration tools for study setup and configuration management, additional query management for data monitoring, and numerous reporting and data analysis tools.  In 2002, Medidata's EDC system was renamed Medidata Rave.

28.     In 2004, Medidata incorporated a clinical data management system ("CDMS") into Medidata Rave, becoming the industry's first unified platform for both EDC and CDMS.  In 2005, Medidata Rave was further extended to become a unified platform for study design, EDC, local lab data capture, migration management and reporting.

29.     In addition to developing clinical trial solutions through its own engineering and customer-focused efforts, Medidata acquired technologies created by other companies and then used Medidata's know-how to improve those technologies and incorporate them into Medidata's suite of applications.  For example, in 2008, Medidata acquired Fast Track Systems, Inc. ("Fast Track"), a provider of clinical trial planning software.  Fast Track's software added trial planning capabilities, including collaborative protocol authoring, contracting and negotiation.

30.     Medidata held its initial public offering ("IPO") on NASDAQ in June 2009.  By that time, Medidata's customer base included 22 of the top 25 global pharmaceutical companies measured by revenue and many middle-market life sciences companies.  In 2009, Amgen, AstraZeneca, Johnson & Johnson, Roche and Takeda Pharmaceutical were Medidata's largest customers measured by revenues.  In the ten years since the release of Medidata's very first SaaS product, Medidata had grown by working closely with its customers to develop and deliver a superior product that responds to customers' operations and needs.  In large part due to Medidata's efforts, by 2009 the pharmaceutical industry had finally overcome its reluctance to adopting SaaS.

31.     In 2011, Medidata announced its acquisition of Clinical Force, a pioneer in providing SaaS-based CTMS, a complex software product akin to enterprise resource planning ("ERP") software.[1]  Clinical Force's CTMS proved a natural fit for Medidata's growing suite of clinical trial software.  By applying its know-how, Medidata was able to improve on Clinical Force's solution and provide customers with added benefits by integrating it with Medidata's own systems and software.

---

[1] Organizations use ERP software for the integrated management of core business processes, including management of product planning, purchase, manufacturing or service delivery, marketing, sales, inventory, supply chain, and customer relationships.

32.     Medidata's suite of applications, known since 2013 as Medidata Clinical Cloud, has grown to address every aspect of the clinical trial process, from concept to conclusion.  Years of solicited customer feedback regarding workflows, requirements and core configurations have allowed Medidata to hone each program's functionality and streamline the interaction between the different programs comprising its suite in a manner that distinguished Medidata from competitors in the market and maximized value for Medidata's customers.

33.     Today, Medidata's cloud based e-Clinical products allow its customers to achieve clinical results more efficiently and effectively by streamlining the design, planning and management of key aspects of the clinical development process, from protocol development and trial set-up to the capture and management of clinical trial data, and analysis and reporting of that data, on a worldwide basis.  In 2015, nine of the top ten selling drugs globally were developed using Medidata's technology.

34.     Throughout its history, Medidata has developed what it refers to as an activity-driven design approach.  By leveraging insights from its customers and from its fifteen years of professional services experience, which have given Medidata a detailed understanding of the role played by each individual involved in a clinical trial, Medidata has been able to achieve real innovations that optimize the clinical trial workflow.  Medidata's unique approach—focused on making processes and systems better suit its customer base—allows it to develop SaaS products that are uniquely well-suited to making clinical trials better, faster, more effective, and more accurate, all of which results in a faster time to market, thus making needed treatments and therapies available to patients far more quickly, while at the same time ensuring higher quality.

35.     Over the years, Medidata's innovations in the biopharmaceutical industry and its commitment to improving healthcare have been recognized and celebrated.  For example, at the 23rd Annual Partnerships in Clinical Trials Conference in 2014, Medidata's "Engage" app

prototype won the Patient Engagement App Challenge (in the large organization category) for its potential to positively transform the clinical trial experience for study participants.  Similarly, in April 2016, Medidata's work with GSK, one of the world's leading research-based pharmaceutical and healthcare companies, on a joint mobile health initiative known as "mHealth," was recognized as the 2016 "Clinical Partnership of the Year" at the inaugural Clinical and Research Excellence Awards.

36.     Most recently, Medidata Payments, an integrated component of Medidata Clinical Cloud and the industry's only global site payment technology driven by EDC, was recognized as the 2016 "Best Technological Development in Clinical Trials – Sponsor Focused" by SCRIP Intelligence, the leading news, data and intelligence service for the global biopharmaceutical industry, which recognizes innovation in platforms that improve the conduct of studies for their sponsors.

### *Medidata Protects its Trade Secrets and Other Confidential Information*

37.     Since 2008, Medidata has invested over $500 million in research and development, exceeding every other player in the industry.  In addition to its investments in developing its range of product offerings, Medidata also has invested significant time and resources in developing a sophisticated understanding of its customer needs and wants (including without limitation information regarding customer contract and subscription details and status as well as the pipelines of future customer opportunities, the overall competitive environment and marketplace for its products, and effective sales strategies (including customer profiles)).

38.     As a result of its extensive investment of time, effort, money and creativity in building and developing its business, including its product offerings, Medidata is the sole owner and proprietor of all right, title and interest in and to a wide range of trade secrets and confidential information relating to, among other things (a) its clinical trial software solutions, including but

12

not limited to information regarding its activity-driven design model and product design principles, software architecture and design, product roadmaps, functionality requirements relating to platform integration across software modules, and clinical trial management tools (including without limitation study design, start-up, strategic monitoring, and analytics functionalities), (b) sales and marketing activities, including but not limited to information regarding customer profiles and segments, "early adopter" customers, historical pricing data, pricing projections, pricing formulae and methodologies across product offerings, product development priorities and pipelines, unannounced products, product release timelines, and industry competitive intelligence, and (c) short- and long-term business plans and strategies concerning marketing, sales, research and technology initiatives, go-to-market strategies, emerging growth areas and opportunities, and geographic/customer expansion opportunities and projections for each of the solutions that it offers (all collectively, the "Trade Secrets").

39.     Medidata conducts critical parts of its research and development activities, and generates a significant portion of its Trade Secrets, at its offices in New York, and through a network of employees who live and work in New York.

40.     As a company built on innovation, extensive industry knowledge and cutting-edge software solutions, Medidata's Trade Secrets are crucial to protecting the value of its investments in innovation for the benefit of its customers, employees and shareholders—and ultimately for the patients who benefit from the treatments and therapies that result from the clinical trials that it supports.  Medidata takes, and at all relevant times has taken, reasonable steps to safeguard its Trade Secrets, including safeguarding its software offerings and the know-how used to develop them.  Medidata has developed and implemented policies and practices at its New York headquarters to safeguard its Trade Secrets at its New York headquarters and around the world.

13

41.     Medidata requires customers, partners and vendors to sign non-disclosure agreements and provides the minimum access to confidential information needed to access Medidata's products.

42.     As a condition of, and in consideration for, employment with Medidata, Medidata requires employees to enter into Confidentiality and Non-Compete Agreements at the commencement of their employment that include confidentiality, non-solicitation and non-competition restrictions.

43.     Regarding Medidata's Trade Secrets, the Confidentiality and Non-Compete Agreements for U.S.-based employees provide in part:

      3.     <u>Confidential Information</u>.

         a.     <u>Company Information</u>.

I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of Medidata or any of its subsidiaries (together, the "Company"), or to disclose to any person, firm or corporation without written authorization of the Board of Directors of Medidata, any Confidential Information of the Company.  I understand that "Confidential Information" means any Company proprietary information, technical-data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including but not limited to, customers of the Company on which I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware, configuration information, marketing, finances or other business information disclosed to me by the Company or to which I have access either directly or indirectly in writing, orally or by drawings or observation of parts or equipment.  I further understand that Confidential Information does not include any of the foregoing items which has become publicly known and generally available through no wrongful act of mine or of others who were under confidentiality obligations as to Confidential Information.

*See, e.g.,* Exhibit A, at 1.

44.     The Confidentiality and Non-Compete Agreements for U.S.-based employees also require them to return all Medidata materials at the time they leave the company:

> 6.    <u>Returning Company Documents</u>.  I agree that, at the time of leaving the employ of Medidata, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other document or property, or reproductions of any aforementioned items developed by me pursuant to my employment with Medidata or otherwise belonging to the Company, its successors or assigns including, without limitation, the records maintained pursuant to section 4(d) [regarding records of "Inventions"].  In the event of the termination of my employment, I agree to sign and deliver to the Company a completed "Termination Certification" [attesting that I have not retained any records, data, notes, correspondence, or other documents belonging to the Company].

*See, e.g.,* Exhibit A, at 4.

45.    The Confidentiality and Non-Compete Agreements for U.S.-based employees contain a separate provision regarding their non-competition obligations:

> 5.    <u>Competitive Activities</u>.  During the term of my employment with Medidata, and for a period of one (1) year thereafter, regardless of the circumstances of termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity anywhere in the world which develops or markets products or performs services which are competitive with the products or services of the Company (a "Competitor"), including but not limited to any business or entity which develops, markets, manufactures or provides consulting services with respect to data management applications for pharmaceutical, biotechnology and genomic companies.  I will not directly or indirectly, engage or participate in the development of any product or service which the Company has under development or which are the subject of active planning at any time during the term of my employment.  Notwithstanding the foregoing, however, I understand that I may hold stock in a Competitor if the stock is publicly traded and the amount of stock I hold is less than one percent (1%) of the outstanding capital stock of the Competitor.  I understand that the restrictions set forth in this Section 5 are intended to protect the Company's interest in its Confidential Information and established customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

*See, e.g.,* Exhibit A, at 3.  Confidentiality and Non-Compete Agreements for Medidata employees based in California contain additional language specific to that state.

46.    Confidentiality and Non-Compete Agreements for U.K.-based employees provide in part:

The Employee acknowledges that during the ordinary course of his/her employment he/she will be exposed to information about the Company's and the Parent's business and that of its suppliers and customers which amounts to a trade secret, is confidential or is commercially sensitive and which may not be readily available to others engaged in a similar business to that of the Company or the Parent or to the general public and which if disclosed will be liable to cause significant harm to the Company and the Parent.

The Employee shall keep secret and shall not at any time during or after his/her employment or after termination of the same for whatever reason, use, communicate or reveal to any person for the Employee's own or another's benefit, any secret or confidential information concerning the Parent or the Company's business, finances, organisation, systems, techniques, proprietary information, know-how, suppliers and/or customers of the Company and/or of the Parent and/or similar information regarding the customers and the suppliers of the Company and/or of the Parent which shall have come to his/her knowledge during his/her employment with the Company.   The Employee shall also use his/her best endeavours to prevent the publication, disclosure or use of any such information. In addition, the Employee agrees that he/she will not during his/her employment with the Company improperly use or disclose any secret or confidential information of any former or concurrent employer or any other person or entity and that he/she will not bring on to the premises of the Company or the Parent any such information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

[T]he Employee shall not for a period of six months after the termination of his/her employment either personally or by an agent and either on his/her own account or for or in association with any other person in connection with the carrying on of business in the field of the Restricted Business offer employment (whether by way of a contract of services, partnership or howsoever and whether on his/her own behalf or on behalf of any other person) to any person who is employed by the Company or any branch of the Company or who is a consultant to the Company or any branch of the Company and in either case is engaged in any senior, executive, technical, advisory, or sales capacity (excluding clerical and administrative work) at the time when notice to terminate the employment is given by or to the Employee provided that this sub-clause shall only apply in relation to consultants or employees or employees of the Company who were known to or who dealt with or worked with the Employee during the 12 months prior to the termination of the Employee's employment.

*See, e.g.,* Exhibit B.

47.     In addition, all Medidata employees are required to comply with its "Code of

Business Conduct & Ethics," which provides in part:

You will learn, work with, and be entrusted with, confidential information relating to our operations and our customers.  You must maintain the confidentiality of

16

confidential information entrusted to you. Confidential information includes all non-public information that, if disclosed, might be useful to competitors, or harmful to us or our customers. Specific examples of information that is confidential include financial information, costs, business projections and any information that is marked confidential. Keeping this information confidential is necessary to ensure our success. Because this information has substantial value to us, you must exercise care not to disclose any confidential information even inadvertently (for example, through conversation in elevators or restaurants), to any unauthorized person in or outside the Company.

Employees must comply with the Company's policy regarding "Confidentiality" as set forth in the Company's Corporate Policy Manual or Employee Handbook.  Each employee has also entered into an Employee Confidentiality, Invention Assignment and Non-Competition Agreement which further explains the Company's trade secret and confidentiality policy, and all employees must adhere to this agreement. Issues with respect to confidential information may also arise in securities transactions.

A true and correct copy of Medidata's Code of Business Conduct & Ethics is attached hereto as Exhibit F.

48.     Moreover, Medidata's Corporate Policy Manual, a true and correct copy of which is attached hereto as Exhibit G, states that:

Medidata Solutions, Inc. has reserved the right to monitor its email system to: (i) ensure that it is being used for proper business purposes; (ii) ensure that policies are being followed; and (iii) access information in an employee's email when that employee is not available. Employees are to disclose information or messages from Medidata Solutions, Inc. email system only to authorized persons. email information is limited to those with a need to know the specific content thereof.

Exhibit G at 11.  Employees are made aware that they "do not have a personal privacy right in any matter created on, received on, or sent from [Medidata]'s email system," and that "[u]se of [Medidata]'s email system to make unauthorized transmissions of [Medidata] computer files may result in immediate termination and appropriate legal action." *Id.*

49.     In addition to the foregoing contractual provisions, Medidata employs security measures, both physical and electronic, at all of its offices and in all of its systems in order to restrict access to its Trade Secrets.  Access to Medidata's systems is password-protected, and the scope of such access is defined by the responsibilities of a particular employee.  Since at least

2014, Medidata has required two-factor authentication for access to its Gmail email and Google Docs document management apps.  Since at least November 1, 2015, Medidata has required use of OKTA, which provides a single point of authentication for all applications company-wide.

50.     As appropriate, Medidata also labels materials as "Proprietary and Confidential" and limits the internal distribution of particularly sensitive materials.  For example, certain sales and marketing materials are not distributed to those outside Medidata's managerial-level sales personnel unless they have a specific work-related need to access such information.

51.     Medidata maintains these measures to prevent its Trade Secrets from entering competitors' hands, so that competitors cannot unjustifiably reap the benefits of Medidata's years of labor and innovation.

### *Veeva Is A CRM Company That Lacks* <br> *Medidata's Innovation Track Record And Experience*

52.     Veeva is a cloud-computing software company founded in 2007.  In 2008, Veeva launched its core product, a cloud-based customer relationship management ("CRM") app that, upon information and belief, was built on Salesforce.com's Force.com platform.   Upon information and belief, until recently Veeva remained essentially a CRM company, with that core product accounting for the majority of Veeva's revenue.

53.     Veeva launched its "Veeva Vault" product, a cloud-based content management platform and related suite of applications for life science customers, in 2016.

54.     Unlike Medidata, Veeva has no track record or experience in developing the clinical SaaS products needed to efficiently and effectively conduct and manage a clinical trial from start to finish.

### *Medidata and Veeva Enter Into an Alliance*
### *For The Benefit Of Their Respective Customers*

55.     In December 2012, Medidata entered into an alliance agreement ("the Alliance") with Veeva to integrate Medidata's software offerings with Veeva's electronic trial master file ("eTMF") system, known as "Vault eTMF."  A true and correct copy of the press release is attached hereto as Exhibit H.  Vault eTMF is Veeva's product for pharmaceutical, biotechnology, and medical products companies to manage documentation associated with the clinical trial and regulatory submission process.

56.     Medidata entered into the Alliance with Veeva because it believed that there were benefits to be derived from providing common customers with a high degree of interoperability between Medidata CTMS and Veeva eTMF.  Such cooperation is common in the industry generally, and for Medidata in particular.  For example, in June 2009, Medidata announced the Medidata Technology Partner Program ("TPP"), a collaboration between Medidata and clinical technology providers.  Similarly, Medidata partnered with Spaulding Clinical in 2010 to develop an integration solution between Spaulding Clinical's Phase I unit and Medidata Rave.  More recently, in 2016 Medidata launched the Medidata eConnect Partner Program, designed to enable the seamless integration of healthcare data—from electronic health records ("EHRs"), electronic medical records ("EMRs"), and clinical trial electronic source data ("eSource") systems—with Medidata's industry-leading platform.

57.     Because, at the time they entered into the Alliance, Veeva did not have EDC, CDMS, or CTMS products, and Medidata did not have an eTMF product, Medidata saw a benefit for its customers in facilitating integration between their respective products.

58.     Medidata's claims in this case do not arise out of or relate to the Alliance, which was terminated on or about July 31, 2017.

## *Veeva Has a Pattern of Stealing Trade Secrets*

59.     An examination of Veeva's activities confirms that it has a pattern and practice of using confidential and competitively sensitive information belonging to other companies for its own benefit.

60.     For example, according to the allegations set forth in a 2014 complaint filed in the U.S. District Court for the Northern District of California by Prolifiq Software Inc. ("Prolifiq") against Veeva alleging misappropriation of trade secrets and patent infringement, Veeva subjected Prolifiq to similarly underhanded tactics.

61.     In its Complaint, a true and correct copy of which is attached hereto as Exhibit I, Prolifiq, which provides a suite of software solutions to companies that market products in regulated environments, alleged that Veeva used a 2011 integration project for a mutual customer to gain direct access to Prolifiq's "Rep Trigger" platform, and then used that access to develop a competing system that would work in conjunction with Veeva's software solutions and provide the same functionality as Prolifiq's Rep Trigger product.  Prolifiq further alleged that, having taken advantage of the integration project to access Prolifiq's trade secrets, Veeva then convinced the mutual customer to switch to Veeva's new competing product.  Exhibit I at ¶ 35.  According to a Stipulation of Dismissal filed in that case, Prolifiq and Veeva settled the lawsuit on November 25, 2014.

62.     Upon information and belief, Veeva's pattern and practice of corporate theft continues unabated to the present day, and is not limited to its efforts against Medidata.  As recently as January 10, 2017, Quintiles IMS Incorporated and IMS Software Services, Limited (collectively, "Quintiles IMS") filed a Complaint in the United States District Court for the District of New Jersey, alleging claims against Veeva for, among other things, misappropriation of trade secrets, tortious interference with contract, unfair trade practices, and unjust enrichment.

63.     In its Complaint, a true and correct copy of which is attached hereto as Exhibit J, Quintiles IMS, a direct competitor of Veeva's providing market research, analytics, technology and services to the life sciences industries, alleges that Veeva had used Quintiles IMS's confidential information to "develop functionality for and to enhance [Veeva's] competitive offerings."   Exhibit J at ¶ 75.   In particular, Quintiles IMS claims that after obtaining Quintiles IMS's confidential information through limited licenses that Quintiles IMS had granted to Veeva in its role as a third-party vendor for certain of Quintiles IMS's clients, solely for purposes of facilitating customers' integration requests, *id*. at ¶ 46, Veeva used that data to "gain insight into the proprietary features and accuracy of [competitive offerings] in order to aggressively tailor its own sales and marketing tactics."  *Id*. at ¶ 73.  As a result of Veeva's tactics, Quintiles IMS alleges that it "has lost and continues to lose business, and has faced increased pressure to lower its prices to stay competitive in the marketplace against Veeva."  *Id*. at ¶ 128.  On June 23, 2017, the court denied Veeva's motion to transfer the action from New Jersey to the United States District Court for the Northern District of California.  A true and correct copy of the opinion is attached hereto as Exhibit K.

64.     Upon information and belief, Veeva's pattern of misappropriating trade secrets and confidential information from others played out with respect to the partnership between Veeva and Sparta Systems ("Sparta"), which in 2013 announced that they would partner to combine Sparta's enterprise quality management solution, TrackWise, with Veeva Vault QualityDocs, a cloud-based document management solution, to enable their shared life sciences companies to strengthen compliance, improve efficiency, and lower costs.  A true and correct copy of the press release is attached hereto as Exhibit L.  On May 26, 2016, Veeva announced its own competing quality management solution, "Veeva Vault QMS."  A true and correct copy of the press release is attached hereto as Exhibit M.

21

65.     On January 24, 2017, Sparta filed a Complaint in the Superior Court of New Jersey Chancery Division, Ocean County, alleging claims against Veeva for tortious interference with contract, unfair competition, and tortious interference with prospective business advantage.  Also named in the Complaint is Scott Mitreuter, a former Sparta employee who left Sparta to join Veeva in early January 2017, against whom Sparta alleges breach of his non-compete agreement.

66.     In its Complaint, a true and correct copy of which is attached hereto as Exhibit N, Sparta accuses Veeva of "strategically target[ing] and recruit[ing] Sparta employees, including Mitreuter, in order to obtain critical intelligence and insight regarding Sparta's quality management solutions, particularly Stratas™, as well as Sparta's customer and prospective customer base."  Exhibit N at ¶ 27.  Sparta further alleges that "Veeva has targeted a number of Sparta employees, including Mitreuter, and attempted to hire them to obtain Confidential Information and other competitively sensitive information and know how in an effort to shorten the time that it would take to legitimately develop a product that can compete with Sparta's products, including Stratas™."  *Id*. at ¶ 28.

67.     According to Sparta, in his roles as Business Analyst and later Product Manager, Mitreuter "developed, acquired and/or had access to significant and highly Confidential Information, including with regard to the strategy, development, enhancement and marketing of Stratas™," and was "critical to Sparta's understanding of its clients' quality management software needs."  *Id*. at ¶¶ 21–22.  By "accepting this employment with Veeva, and assuming a role that is comparable to what he had at Sparta, relating to products competitive to those sold by Sparta," Sparta alleges that "Mitreuter violated, and continues to violate, the non-competition restrictions" between himself and Sparta.  *Id*. at ¶ 29.

68.    On January 25, 2017, the Superior Court of New Jersey issued an order, a true and correct copy of which is attached hereto as Exhibit O, temporarily enjoining and restraining Mitreuter from:

A. Directly or indirectly working in any business competitive with Sparta's business for a period of nine (9) months following the termination of Mitreuter's employment on January 3, 2017;

B. Using Sparta's Confidential Information or trade secrets, or otherwise disclosing them to Defendant Veeva, and prohibiting Veeva from receiving or using such information; [and]

C. Directly or indirectly soliciting, contacting, calling upon, diverting or communicating or doing business with those Sparta customers or prospects which Mitreuter contacted, solicited or serviced, or about which he had Confidential Information[.]

Exhibit O at 2.  In addition, both Mitreuter and Veeva are temporarily enjoined and restrained from:

D. Recruiting, hiring or attempting to recruit or hire, directly or by assisting others, any other current employee of Sparta.

*Id*.

69.    According to the June 1, 2017, Stipulation of Dismissal filed in the case, Veeva settled Sparta's lawsuit against it.

70.    Since December 2015, Veeva has hired six former Sparta employees in addition to Scott Mitreuter, including Michael Jovanis (VP, Vault Quality); Dave Mauro (Director, Global KOL Sales); Ashley Wentworth (Senior Manager, Vault Quality), Matthew Kopecky (Senior Solution Consultant); Paola DePaso (Director, Vault Quality); and Mickey Landkof (Director, Vault Quality).

71.    In retaliation for the various efforts by Medidata, Quintiles IMS and Sparta to prevent its pattern of trade secret misappropriation, Veeva filed suit against them in California State Superior Court on July 17, 2017.  A true and correct copy of the complaint is attached hereto

as Exhibit P.  Although Veeva asserts that restrictive employment agreements are the essence of

that dispute, the complaint is a distraction calculated to prevent others from protecting themselves

against Veeva's theft of trade secrets.

### *Veeva Has A Policy Of*
### *Disregarding Non-Compete Agreements*

72.     Veeva admits its disdain for non-compete agreements and publicizes that position

as a company policy.   Earlier this year, on a page titled "Our Position on Non-Compete

Agreements" that Peter Gassner ("Gassner"), co-founder and CEO of Veeva, personally endorsed,

Veeva's website expressly proclaimed that "[n]on-competes are an outdated business practice,"

and that Veeva "will not let a current or past non-compete agreement prevent us from hiring a

qualified candidate":

 Our Position on Non-Compete Agreements

...

The practice of non-compete agreements conflicts with our value of employee
success. Non-competes are an outdated business practice. We don't ask employees to
sign them and we will not let a current or past non-compete agreement prevent us
from hiring a qualified candidate.

*See* https://www.veeva.com/noncompetes/, last visited on January 25, 2017, a true and correct

copy of a printout of which is attached hereto as Exhibit Q.

73.     Indeed, Veeva has identified its disdain for non-compete agreements as a

significant contributor to its success, and has publicly stated that this attitude has "made the

founding and growth of countless tech companies possible, including … Veeva."  *Id*.  Veeva has

further publicly stated on its website that it "will defend you against attempts to enforce your

existing non-compete":

24

Break the non-compete cycle. Join a progressive company that does not require you to sign a non-compete and that will defend you against attempts to enforce your existing non-compete. Don't let the threat of a non-compete or lawsuit derail your career. Most

*Id*.

74.     Veeva has even gone so far as to assure prospective employees that if a former employer pursues a claim, "Veeva will provide for your full legal representation," and in the event a non-compete restricts the employee's ability to work at Veeva, "you will retain your position and your compensation will continue unaffected":

employer pursues a claim, Veeva will provide for your full legal representation and help make the process as easy as possible. In the unlikely event a non-compete delays or restricts your work at Veeva, you will retain your position and your compensation will continue unaffected.

*Id*.

75.     As Veeva itself has told prospective employees:

We are focused on building a special company that does the right thing by our customers and employees. Join us and don't let a non-compete stand in your way.

*Id*.   This brazen approach to competition is emblematic of Veeva's anticompetitive business culture, and indicative of its refusal to act in accordance with the laws of the jurisdictions in which it operates, including New York, in seeking to unfairly accelerate its go-to-market strategy.

### *Veeva Has Engaged In A Campaign Of*
### *Selectively Poaching Medidata's Employees*

76.     Upon information and belief, Veeva's guiding philosophy of disregard for non-compete agreements has driven its approach to Medidata's Trade Secrets and confidential information.  Upon information and belief, Veeva has engaged in, and continues to engage in, a deliberate scheme to specifically target and poach key senior Medidata employees in order to build a team with comprehensive knowledge of Medidata's software; software architecture; platform

integration; customer usage and expectations; pricing; industry competitive intelligence; clinical trial management tools, including study start-up and strategic monitoring; activity-driven design; and short- and long-term business strategies concerning marketing, sales, research and technology initiatives, product roadmaps, go-to-market strategies, and geographic/customer expansion.

77.     Like other Medidata employees, all of the Former Employees entered into Confidentiality and Non-Compete Agreements with Medidata during their employment, pursuant to which they continue to owe obligations to Medidata.  For example, all of the Former Employees are required, upon termination of their employment with Medidata, (a) not to use, divulge or disclose to third parties Medidata's Trade Secrets or confidential information, (b) to return all Medidata property in their possession, custody or control, and (c) for a period of six months to one year after the termination of their employment with Medidata, to refrain from engaging in certain competitive and solicitation activities in a specific geographic area for a finite period of time.  The Confidentiality and Non-Compete Agreements signed by U.S. employees are governed by New York law.  All of the preceding requirements are explained in detail within the Confidentiality and Non-Compete Agreements signed by each of the Former Employees, true and correct copies of which are attached hereto as Exhibits A–E.

78.     All of the Former Employees also agreed to the following provision (or a substantively similar provision) regarding disclosure of Trade Secrets:

> The Employee shall keep secret and shall not at any time during or after his/her employment or after termination of the same for whatever reason, use, communicate or reveal to any person for the Employee's own or another's benefit, any secret or confidential information concerning [Medidata's] business, finances, organisation, systems, techniques, proprietary information, [or] know-how, suppliers and/or customers of [Medidata] and/or similar information regarding the customers and the suppliers of [Medidata] which shall have come to his/her knowledge during his/her employment with [Medidata].  The Employee shall also use his/her best endeavours to prevent the publication, disclosure, or use of any such information.

*See, e.g.,* Exhibit B at Section 1.2.

26

79.     The Former Employees further expressly acknowledged, by agreeing to the following provision (or a substantively similar provision), that certain types of information, without limitation, are "secret and confidential," including but not limited to:

a)      raw materials;
b)      proprietary information, inventions, technology, software, hardware configuration information, research and development, know how and technical data;
c)      formulae and formulations and recipes;
d)      methods of treatment, processing, techniques, manufacture or production, process and production controls including quality controls;
e)      suppliers and their production and delivery capabilities;
f)      customers and details of their particular requirements;
g)      potential customers and details of their particular requirements where such potential customers have been solicited by the Company or the Parent in the past 12 months or in respect of which plans for solicitation have been made in respect of the same period;
h)      castings, profit margins, discounts, rebates and other financial information;
i)      marketing strategies and tactics;
j)      current activities and current and future plans relating to all or any of development, production, marketing or sales including the timing of all or any such matters;
k)      the development of new products and services;
l)      production or design secrets;
m)      technical design, drawings or specifications of the Company's products;
n)      pricing, credit policies, credit procedures, payment policies, payment procedures and systems for the same whether of the Company or of any customer or supplier.

*Id*. at Section 1.3.

80.     The Former Employees also expressly agreed to a reasonable non-compete provision, limited in time to six months or one year depending on the jurisdiction, for the purposes of protecting Medidata's confidential information and customer relationships.  *Id*. at Section 4.

81.     Upon information and belief, by mining the Former Employees' specific knowledge of Medidata's Trade Secrets, Veeva's development team has sought to close the knowledge gap between Veeva and Medidata by using the information Medidata has built up over the years regarding use cases, customer workflows, and other domain-specific knowledge to hasten development of a competing product.  Indeed, many of the Former Employees currently fill roles

at Veeva wherein the Trade Secrets and confidential information they acquired at Medidata would inevitably prove beneficial and valuable to Veeva in developing competing products.

82.    Medidata also has learned that several former Medidata employees who subsequently were hired by Veeva retained copies of highly confidential Medidata documents containing Trade Secrets after leaving Medidata, in violation of their obligations under their Confidentiality and Non-Compete Agreements.    On June 27, 2017, four of the Former Employees—Mateo, Marlborough, Pepe, and Rizzo—together with Josh Brouillette ("Brouillette") (all collectively, the "Producing Individuals") informed Medidata, wholly unprompted, that they were returning more than 3,100 Medidata documents (the "Retained Medidata Documents") that they had wrongfully retained after leaving Medidata.

83.    Many of the Retained Medidata Documents were prominently marked "Proprietary and Confidential."  The Retained Medidata Documents included (a) slide decks reflecting sensitive go-to-market plans and milestones, (b) sales projections and goals for upcoming quarters and years, (c) spreadsheets tracking revenue and sales down to the individual customer and product or service, (d) spreadsheets containing customer contract details including contract length and renewal periodicity, (e) spreadsheets setting forth customer-specific pricing formulae and pricing proposals, and (f) slide decks discussing research and development projects including the development of features based on customer usage and needs.  Access to such material would provide Veeva a detailed picture of Medidata's internal sales strategies, sales effort timing, product differentiation, and profit margin by customer and product, enabling Veeva to undercut and capitalize on Medidata's efforts rather than competing on a level playing field.

84.    Upon information and belief, Pepe was Veeva's first significant hire from Medidata.  Pepe was hired by Medidata through the acquisition of Fast Track in 2008.  In 2009, Pepe was promoted to Senior Client Relations Specialist, serving as a subject-matter expert in the

use of clinical trial planning data and software to the product management, sales and marketing teams.  Pepe also developed and fostered relationships with clients and their managers, where she became intimately familiar with customer requirements and usage.  Pepe then served as a CTMS Project Manager before transitioning in 2013 to Medidata's Business Consulting department. Through her various roles at Medidata, Pepe acquired significant amounts of technical and specific customer knowledge concerning Medidata's CTMS solution and related functionality involving site monitoring, analytics, and payments.  At the time of her departure from Medidata on October 4, 2013, Pepe was a Senior Product Manager.

85.    Pepe's non-compete obligation remained in force until October 2014, and she joined Veeva on May 5, 2014.  At the time Pepe joined Veeva, it did not have a CTMS product that could have utilized Pepe's skills.  Upon information and belief, Pepe's hiring catalyzed Veeva's efforts to appropriate Medidata's Trade Secrets.  Upon information and belief, Pepe's current role at Veeva closely mirrors her former responsibilities at Medidata.  Veeva itself has emphasized Pepe's prior experience at Medidata as well as her familiarity with Medidata's CTMS:

 

**SONDRA PEPE**
SENIOR PRODUCT MANAGER

Sondra Pepe is a senior product manager at Veeva focused on Vault CTMS. Sondra's passion for life sciences started with work in healthcare providers' offices and migrated into clinical software. Sondra has over 12 years of direct experience with a wide range of different clinical research technologies, including protocol authoring, study design, CTMS, study start-up, monitoring visit reports, and risk-based monitoring.

Prior to joining Veeva, Sondra worked as a senior product manager at Medidata Solutions in CTMS and grants management planning. Sondra is a certified clinical research professional who has published articles in the Journal of Clinical Studies and PharmaExec.com. Sondra has also presented her work at industry conferences such as DIA, the Tufts CSDD Executive Forum, and SoCRA.

86.    While employed by Veeva, Pepe retained and has had access to at least 58 Retained Medidata Documents, including internal Medidata e-mails relating to the development and

demonstration to customers of specific CTMS features.  Many of these emails were sent to her personal "Gmail" address, in clear violation of Medidata's confidentiality policies, and several were sent within days of her departure from Medidata.  The detailed information of Medidata's CTMS product development process included in such e-mails would be instrumental, and extremely valuable, to a competitor such as Veeva in seeking to enter a new market in which it had no prior experience.

87.     After it hired Pepe, Veeva added the other Former Employees, each of whom had had senior roles at Medidata.

88.     Upon information and belief, Veeva's scheme to appropriate Medidata's Trade Secrets was further facilitated by the second Former Employee it hired, Mateo.  During his almost ten years at Medidata, Mateo, who has a computer science background, rose from Vice President of North American Sales to, at the time of his departure from Medidata on February 28, 2015, Executive Vice President of Field Operations.

89.     As an executive officer of Medidata, Mateo's responsibilities included personal involvement in customer and partner relationships, management of the company's sales organization and participation in company strategy and business planning activities.  Indeed, Mateo led the negotiations between Veeva and Medidata regarding the Alliance.  Due to his senior position at Medidata, Mateo was highly knowledgeable regarding Medidata's product offerings, its go-to-market strategy, and its customers' needs with respect to EDC and CTMS products.  He also was intimately familiar with the unique skills, work experience, areas of responsibility, and work performance of many Medidata employees.

90.     Mateo joined Veeva in March 2015, while still subject to a non-compete agreement that remained in effect until February 28, 2016.

91.     Upon information and belief, Mateo works for Veeva in the New York City metro area.

92.     Upon information and belief, Mateo's responsibilities at Veeva, which involve preparing products and services meant to directly compete with Medidata's products and services, heavily implicate the confidential knowledge gained from his role at Medidata, including customer requirements, market opportunities, and strategic planning regarding sales and product roadmaps. On its website, Veeva emphasizes Mateo's prior experience at Medidata "selling clinical cloud solutions in life sciences":



**ALAN MATEO**
EXECUTIVE VICE PRESIDENT, GLOBAL SALES 

Alan is executive vice president of global sales for Veeva. He brings more than 30 years of experience in enterprise software.

His career is marked by directing high-performing sales teams and forging strategic relationships with leading companies. Alan spent the last 10 years selling clinical cloud solutions in life sciences while head of worldwide field operations at Medidata Solutions. Prior to Medidata, Alan worked in various sales positions at top software companies including PeopleSoft, JD Edwards, and Red Pepper Software. At PeopleSoft, Alan headed up the product sales organization, helping to drive PeopleSoft's transition to a billion-dollar company with multiple product lines. He also led the successful integration of the JD Edwards and PeopleSoft sales organizations with combined revenue of more than $2.5 billion.

93.     Since joining Veeva as a member of its executive management team, with responsibility for its global sales organization, upon information and belief, Mateo has used his expertise, in violation of his contractual and fiduciary duties to Medidata, to guide and facilitate Veeva's development of products intended to directly compete with Medidata, using confidential and proprietary information gained from his employment at Medidata.

94.     While employed by Veeva, Mateo retained and has had access to at least 60 Retained Medidata Documents, including (a) slide decks reflecting go-to-market planning and milestones, sales projections and goals and (b) spreadsheets tracking sales (including by customer, geographic region, and sales person), customers and associated revenue, pricing formulae and

methodology, and specific customer pricing proposals. Many of these files contain Medidata's confidential and proprietary data and projections that are and continue to be competitively valuable, such as customized pricing formulae that Veeva could use to undercut Medidata and contract expiration dates that Veeva could use to time its targeting of specific current Medidata customers. Furthermore, while he has been employed by Veeva, Mateo has accessed at least one Medidata Retained Document, namely an Excel file titled "sample.xlsx" containing 24 separate spreadsheets incorporating Medidata's confidential sales data and sales targets.

95.  Upon information and belief, Mateo has disclosed Medidata's Trade Secrets and other confidential information to Veeva and used them to design and accelerate the development of Veeva products intended to compete directly with Medidata, in violation of the non-disclosure provisions, non-solicitation and non-competition provisions in his Confidentiality and Non-Compete Agreement.

96.  Upon information and belief, Mateo also facilitated Veeva's targeting of other Medidata employees by disclosing Medidata's Trade Secrets to Veeva, including highly confidential information regarding Medidata's sales personnel, which aided Veeva in determining which Medidata employees have valuable knowledge of Medidata's Trade Secrets that would make them advantageous targets for poaching. Indeed, upon information and belief, Veeva subsequently hired several of the individual sales persons identified by name in the internal Medidata sales documents that Mateo retained after leaving Medidata to join Veeva. Further, Mateo personally contacted at least two current Medidata senior employees, a Managing Director of Analytics and a Vice President of Platform Strategy, in what ultimately were unsuccessful attempts to recruit them on behalf of Veeva. Mateo's contacts with and attempted solicitation of the current Managing Director of Analytics occurred not later than November 2015—during Mateo's non-compete and non-solicitation period.

32

97.     Upon information and belief, Veeva incentivized Mateo's breaches of his contractual and fiduciary obligations to Medidata with significant grants of Veeva stock options and restricted stock awards at the time he joined Veeva in June 2015, which have amounted to hundreds of thousands of shares of Veeva stock.  Upon information and belief, such grants far exceeded the industry norm for someone in Mateo's role.  Upon information and belief, Mateo recently has been cashing in on his Veeva equity.  Within days of receiving each monthly and quarterly grant of stock options under Veeva's incentive plan, Mateo has sold thousands of shares of Veeva stock.  Mateo also has made one-off sales of Veeva shares that have increased in quantity over time.  For example, on September 1, 2016, Mateo sold 42,256 Veeva shares worth $1.7 million, on November 23, 2016, he sold 51,605 Veeva shares worth $2.3 million, and on March 22, 2017, he sold 63,433 Veeva shares worth $3.2 million.  To date, Mateo has sold all but 5,985 of the 247,909 stock options and equivalent securities granted to him by Veeva.  These transactions have netted Mateo in excess of $11.5 million after only working at Veeva for approximately two and a half years.

98.     Marlborough was the third Former Employee to join Veeva.  In her roles at Medidata, which were both technical and customer-facing, Marlborough was exposed to Medidata's integrated processes and operations, which afford Medidata a competitive advantage within the marketplace.

99.     As a result of her previous role as a Director in the Product Management department of Medidata's R&D Division, and later as Vice President of Product Management, Marlborough is intimately familiar with the features, workflows, customer requirements, and overall system architecture of Medidata's Clinical Cloud, including Medidata's CTMS, which information essentially is a blueprint for creating a competing product.  Marlborough also was involved in developing Medidata's short- and long-term goals for Medidata's entire platform of e-Clinical

33

solutions, including but not limited to marketing strategies, competitive intelligence and product innovations scheduled for the coming years.

100.   As a Director in the Product Management department of Medidata's R&D Division, Marlborough was responsible for managing a team of Product Managers and the Technical Documentation group; assisting Product Managers and participating in designing and establishing overall product features; setting and managing product release timelines; managing and participating in the creation of all Software Development Life Cycle documents such as Functional Specifications, Trace Matrix, and Release Notes; managing and assisting other Product Managers in managing product validation cycles; overseeing product/version rollout post validation; and working with Engineering Management and Software Quality Assurance Management to appoint and guide cross-functional teams to translate product vision to product deliverables. In that role, Marlborough had extensive experience with Medidata's activity-driven design approach, and had a deep understanding of how the use of that approach sets Medidata's products apart from those of its competitors.

101.   In August 2015, Marlborough transitioned from a technical Product Management role to a commercially focused role, first in Sales Operations and later in Sales Enablement, where she was tasked with channeling her technical and product expertise into a sales-focused framework in order to increase productivity and performance in the sales organization. Marlborough's responsibilities included developing and implementing enablement strategies, as well as creating relevant sales presentations and related content on topics such as product functionality and roadmap, pricing and competitive positioning concerning the company's products and services, sales processes, and sales methodology. In each of her roles at Medidata, Marlborough's responsibilities, which included participation in customer focus groups and customer ride-alongs,

afforded her the opportunity to gain a deep understanding of Medidata's customers' needs, use cases and expectations.

102.    In her final roles before leaving to join Veeva, Marlborough had access to highly confidential information concerning Medidata's growth strategies in the areas of technology, sales and marketing, among others, through at least 2018.  Marlborough also was involved in and aware of timelines for specific product rollouts, go-to-market strategies and Medidata's efforts towards geographic and customer expansion.

103.    Further supporting Medidata's belief that Marlborough's recruitment was part of a scheme orchestrated by or known to the highest executive management levels at Veeva to appropriate Medidata's Trade Secrets is the fact that, upon information and belief, Veeva's co-founder and CEO, Gassner, and Mateo each were personally involved in Marlborough's hiring process.  Upon information and belief, such high-ranking involvement in the hiring process of an executive of Marlborough's level is unusual, particularly for a company of Veeva's size.  Upon information and belief, it also was unusual for a company based in Pleasanton, California, as Veeva is, to allow Marlborough to continue to reside in Red Hook, New York, when the product management personnel she managed were located in California.

104.    Marlborough left Medidata on July 15, 2016, and joined Veeva on July 25, 2016. She was subject to a non-compete obligation until January 6, 2017.  Upon information and belief, Marlborough left Veeva in or about May 2017.

105.    Upon information and belief, while Marlborough was employed by Veeva, she continued to reside and work in Red Hook, New York.

106.    Marlborough's role as Vice President of Product Management at Veeva closely mirrored her former responsibilities at Medidata.  Indeed, Veeva emphasized Marlborough's prior experience at Medidata, stating that she was "responsible for Medidata's full product suite" and

"led the product management team to create new modules and capabilities across the clinical development process":



MICHELLE MARLBOROUGH
**VICE PRESIDENT, PRODUCT MANAGEMENT** 

As vice president of product management, Michelle is responsible for the definition and delivery of Vault CTMS. With over 18 years of experience in life sciences and software development, Michelle has been at the forefront of transforming clinical trials through innovative technology and analytics.

Most recently, Michelle was vice president of product strategy at Medidata Solutions, where she was responsible for Medidata's full product suite. In this role she led the product management team to create new modules and capabilities across the clinical development process. During her time at Medidata, Michelle was named a Healthcare Business Women's Association rising star and was named to the 2014 Pharmavoice 100.

Before making the shift to the technology sector, Michelle worked in data management roles at GlaxoSmithKline and AstraZeneca. There she experienced firsthand the burden data managers struggle with because of outdated processes and systems. Michelle earned her bachelor of science degree in biology and mathematics from Coventry University.

107.    While employed by Veeva, Marlborough retained and had access to at least 984 Retained Medidata Documents, including slide decks covering research and development projects and emails discussing technical implementation of specific features.  This internal knowledge of the CTMS product development process would be instrumental to Veeva in entering a market in which it had no prior experience.

108.    Young was the fourth of the Former Employees to join Veeva.  In his role as Vice President, Global Consulting Partners, Young had access to competitively sensitive information related to Medidata's largest and most highly strategic partners, involving some of Medidata's largest accounts and combined sales opportunities.  Previously, as director of Regional Sales, Young gained extensive knowledge about Medidata's competitive position, go-to-market strategy, functionality, product road maps, use cases, pricing, and strategic partner and customer relationships.

109.    Young left Medidata on April 19, 2016, and joined Veeva in or before September 2016.  His non-compete obligation to Medidata continued until October 14, 2016.

110.    Young's current role at Veeva closely mirrors his responsibilities as Vice President,

Global Consulting Partners at Medidata.  Veeva emphasizes Young's prior experience at Medidata

"establishing new partner relationships with the leading life sciences consulting organizations," as

well as his responsibilities regarding "customer interactions and driving new business":



RICHARD YOUNG 
VICE PRESIDENT, VEEVA VAULT EDC

As vice president for Veeva Vault EDC, Richard is responsible for establishing Veeva Vault EDC as the best in class solution for all data acquisition, management and reporting purposes. With almost 25 years of experience in life sciences, Richard is known for his executive vision and proven operational experience in data management, eClinical solutions, and advanced clinical strategies.

Most recently, Richard served as vice president of global consulting partners at Medidata Solutions, where he established new partner relationships with the leading life science consulting organizations. Richard also spent a number of years leading the mid-market Europe, Middle East, and Africa sales team at Medidata, where he was responsible for all customer interactions and driving new business. In his roles, Richard spent considerable time consulting on adaptive trials, risk based monitoring, big data, mobile health, and other major data strategies with sponsors and partner organizations across the globe.

Richard also held operational roles in both pharmaceutical and contract research organizations, such as GlaxoWellcome, Novo Nordisk, Chiltern and PAREXEL, before moving into business development with Cmed. Richard holds a bachelor of science degree in biochemical sciences from Coventry University.

111.    Upon information and belief, Young has disclosed to Veeva, in violation of his

contractual and fiduciary obligations to Medidata, confidential and proprietary information about

Medidata's products, personnel and customers that Veeva has used to develop its competing

products and establish a launch plan and go-to-market strategy for the Vault EDC product.  In

particular, upon information and belief, Young has shared with Veeva insights and understanding

regarding CROs, a customer segment that Veeva, which sells its products directly to

pharmaceutical companies, has not previously served.  His experience would have been

particularly valuable to Veeva given its lack of institutional experience with the needs and

requirements of the CRO market.  In addition, upon information and belief, Young has shared with

Veeva information he gained from Medidata about how to structure relationships with global

systems integration service providers and how to price the various product offerings that make up a CTMS platform, as well as commercially valuable information regarding specific Medidata partners and customers.

112.    Rizzo was the most recent of the Former Employees to join Veeva.  In his role as Vice President of Product Sales at Medidata, Rizzo had extensive knowledge of Medidata's Trade Secrets regarding competitive position, product road maps, functionality, use cases, pricing, and customer relationships.  In his previous role as Senior Director, Sales, Rizzo managed a team of Area Sales Directors, and in the process became intimately familiar with Medidata customers' requirements and usage.

113.    Rizzo left Medidata on February 23, 2016, and joined Veeva in October 2016.  He was subject to a non-compete obligation to Medidata until February 23, 2017.

114.    Rizzo's current role at Veeva closely mirrors his former responsibilities at Medidata.  Veeva emphasizes Rizzo's prior experience at Medidata "where he led the sales of several product lines," as well as "positioning EDC as both head of strategic accounts and an individual producer":



JASON RIZZO
SENIOR DIRECTOR, VAULT EDC SALES

Jason is senior director, sales, Veeva Vault EDC. He brings nearly 20 years of life sciences experience to his role at Veeva, where he leads the EDC sales team. Recognized for building customer-centric and inquisitive sales teams, Jason combines his broad expertise in e-Clinical applications with deep domain knowledge in the drug development functions of data management and clinical operations.

Prior to joining Veeva, Jason held multiple roles of increasing responsibility at Medidata Solutions, culminating in vice president, platform sales, where he led the sales of several product lines. As vice president, Asia Pacific sales, Jason served as the senior field executive in the region spearheading Medidata's continued growth in Japan, while leading their expansion into Australia, China, Korea, and Singapore. Additionally, Jason spent more than seven years positioning EDC as both head of strategic accounts and an individual producer.

Before entering the EDC space, Jason sold clinical and data services at two world-class clinical research organizations - INC Research and Theradex Systems. He earned his bachelor degree at Greensboro College and holds an MBA from the University of Notre Dame.

38

115.    While employed by Veeva, Rizzo retained and has had access to at least 1,081 Retained Medidata Documents, including slide decks reflecting go-to-market planning and milestones, sales projections and goals, and spreadsheets tracking sales, customers and associated revenue, pricing formulae, and pricing proposals.  Many of these files contained Medidata's confidential and proprietary data and projections that are and continue to be competitively valuable.

116.    Upon information and belief, Rizzo has disclosed to Veeva, in violation of his contractual and fiduciary obligations to Medidata, confidential and proprietary information about Medidata's products, personnel and customers that Veeva has used to develop its competing products and establish a launch plan and go-to-market strategy for the Vault EDC product.  In particular, upon information and belief, Rizzo has disclosed to Veeva, and Veeva has used, commercially valuable information regarding the pricing of clinical trial management products, the target markets and customers for those products and how a CTMS product should be integrated with, and can be used to sell, a clinical trial management platform.

117.    Upon information and belief, Rizzo also facilitated Veeva's targeting of other Medidata employees by aiding Veeva in determining which Medidata employees have valuable knowledge of Medidata's Trade Secrets that would make them advantageous targets for poaching. Indeed, Rizzo personally contacted at least one current Medidata senior employee, a Corporate Strategy Director, in what ultimately was an unsuccessful attempt to recruit him on behalf of Veeva.  Further, Rizzo's contacts with and attempted solicitation of the current Corporate Strategy Director occurred not later than January 2017—during Rizzo's non-compete and non-solicitation period.

118.    Upon information and belief, several of the Former Employees misrepresented their future plans to Medidata at the time of their departures, including whether those plans involved

employment with Veeva in connection with competing products, in order to conceal their intention to violate their contractual and fiduciary obligations to Medidata.  Young specifically denied to Medidata, at the time of his departure from the company, that he planned to join Veeva—only to turn up at Veeva several months later.  Marlborough falsely claimed at the time of her departure from Medidata that she was going to be involved with Veeva's document management products and provided assurances that she would not be in a position at Veeva to use any strategic insight she has been exposed to at Medidata.  In fact, however, she was responsible for the definition and delivery of Veeva's directly competing integrated EDC/CTMS product offering.  Rizzo claimed during his exit interview that he wanted to do something different with his career and would be taking a sabbatical, but in fact reappeared at Veeva several months later in what, upon information and belief, effectively is the same sales role he had at Medidata, leading Veeva's efforts with respect to a product that Veeva has never before offered but in which Medidata has devoted years of experience.

119.    In order to protect its Trade Secrets and confidential information, after their departure Medidata sent letters reminding Marlborough and Young of their ongoing obligations to Medidata.

120.    That Veeva and the Former Employees have been deliberately targeting Medidata employees is confirmed by a review of Veeva's recent contacts and hiring patterns, which shows that a disproportionate percentage of Veeva's hires over the last year have come from Medidata. In 2016, Veeva hired more than twice as many individuals from Medidata as it did from such other competitors as Oracle Health Sciences, Parexel and CSC Life Sciences, which likely would have been equally good sources of qualified and experienced candidates.  Upon information and belief, this disparity reflects Veeva's focus on recruiting not talent with general knowledge and skills in the industry, but rather individuals with the specific knowledge of Medidata's products necessary

to utilize Medidata's confidential information to accelerate Veeva's go-to-market strategy, including but not limited to telling program developers what kinds of code they should write. That this has been the case is reflected in the fact that the Former Employees, all possessing a wealth of competitively sensitive information regarding Medidata's products, have at various times made up nearly a third of Veeva's "Clinical Leadership." *See* https://www.veeva.com/products/clinical-data-management/leadership/, last visited on January 25, 2017, a true and correct copy of a printout of which is attached hereto as Exhibit R.

121.   Upon information and belief, Veeva's deliberate targeting of key Medidata employees has not been limited to the Former Employees. In recent months, Veeva, assisted by the Former Employees, has unsuccessfully solicited at least eight additional senior-level Medidata employees holding the following titles: Corporate Strategy Director; Managing Director of Data and Analytics; two Vice Presidents; Director of Product Management; Client Services Principal; Regional Sales Director; and Managing Principal Engagement Consultant.[2] Two of these targeted employees are members of Medidata's Strategy Team, a group that formerly included Marlborough. Upon information and belief, Veeva and Mateo have contacted additional Medidata employees to persuade them to join Veeva. For example, after filing the initial complaint, Medidata learned that Veeva had recruited and hired Juliane Kim Hoang Tan, who served through December 2016 as Medidata's Senior Manager, Proposals & Contracts and who has specific current knowledge of Medidata's business proposals, customer contracts and pricing for all of Medidata's products.

---

[2] Veeva also has hired the following eleven, largely lower-level Medidata employees, of whom all but two were hired within the last several years: Jody Spooner, Kyle Davids, John Wilson, Zoltan Szarka, David Gemzik, Rachel Lowrey, Sonia Araujo, Michael Jovanis, Anthony Tsai, Josh Brouillette, and Glenn Wira.

122.    In at least one version of its anti-non-compete manifesto, Veeva has attempted to frame itself as a "special company that does the right thing by our customers and employees." Exhibit Q.  But Veeva's words are at odds with its actions.  Medidata expects, and welcomes, robust competition—it drives innovation and is good for companies and consumers alike.  But competition should be fair.  Unfair competition, such as that engaged in by Veeva with respect to Medidata, is demoralizing to employees, improperly rewards companies with the fruits of others' labor rather than their own, facilitates unjustified entry into the marketplace, damages truly innovative companies, and ultimately harms consumers—in this case, the patients who ultimately stand to benefit from the clinical trials sponsored by Medidata's customers—by reducing if not eliminating the incentive and ability for true innovators to create and develop new products.

### *Veeva Introduces Competing CTMS and EDC Products Developed Through Trade Secrets Improperly Obtained from Medidata's Former Employees*

123.    Upon information and belief, executing its plan to use Medidata's Trade Secrets and confidential information to leapfrog into the market, on June 22, 2016, Veeva announced its first CTMS offering, Veeva Vault CTMS, which was released in the first quarter of 2017.  A true and correct copy of the press release is attached hereto as Exhibit S.  On October 13, 2016, Veeva announced its first EDC offering, Veeva Vault EDC.  A true and correct copy of the press release is attached hereto as Exhibit T.

124.    Veeva released Vault EDC on April 25, 2017.  A true and correct copy of the press release related to that launch is attached hereto as Exhibit U.  In its Fiscal Year 2018 Second Quarter Results, a true and correct copy of which is attached hereto as Exhibit V, Veeva claims to have signed up seven customers for Vault CTMS and two for Vault EDC.

125.    Veeva advertises its Veeva Vault Clinical Suite, of which Vault CTMS and EDC are parts, as "the industry's only suite of unified cloud applications to streamline clinical operations and data management, from study startup to archive."  Exhibit T.

126.   Veeva's announcement and corresponding marketing materials touted several specific features and functionality that had been the focus of internal and highly confidential strategy discussions at Medidata, particularly in-progress and forthcoming research and technology initiatives.  For example, Veeva's claim that Veeva Vault CTMS is "a single source of truth across clinical operations" closely mirrors, both in specific language and functionality, discussions Marlborough had regarding short-term strategy goals while Medidata's Vice President of Product Strategy.  The similarities, of which these are just examples, were too numerous and precise to be mere coincidence.

127.   On October 18, 2016—a mere three months after joining Veeva—Marlborough delivered a presentation at Veeva's 2016 Global R&D Summit describing its then-forthcoming CTMS product.  Moreover, Veeva continued to tout features and functionality such as the "single source of truth" that were suspiciously similar to Medidata's own product development plans.  Based on Marlborough's October 2016 presentation and Veeva's other public descriptions of its CTMS product, it appears that Veeva's go-to-market strategy relied on access to Medidata's Trade Secrets.

128.   An examination of Marlborough's Medidata e-mail account showed that on May 19, 2016, less than two months before her departure for Veeva, and while she was still employed by Medidata in New York and actually working out of Medidata's New York office, Marlborough used her Medidata account to send herself, at her personal "Gmail" account, an Excel spreadsheet (the "Market Fit Spreadsheet") containing competitively sensitive Medidata material.  Among other things, the Market Fit Spreadsheet contains key information regarding prioritization of Medidata's 2014 product roadmap.  The roadmap also contains information on "RBM (SQM)," which was Medidata's predecessor offering to what is now known as "strategic monitoring."  This directly violated the terms of Medidata's Corporate Policy Manual, which states "[u]se of

[Medidata]'s email system to make unauthorized transmissions of [Medidata] computer files may result in immediate termination and appropriate legal action." Exhibit G at 11.

129.  Upon information and belief, at Veeva's instigation and urging, the Former Employees provided Veeva with access to Medidata's Trade Secrets in violation of their obligations to Medidata, including but not limited to both their contractual obligations and their ongoing fiduciary duties as former employees of Medidata. Upon information and belief, at least Former Employee Marlborough provided Veeva with Medidata's Trade Secrets while in New York.

130.  In the months following Veeva's product announcements, many of Medidata's investors, analysts, clients, prospective clients, and partners across the country, including in New York, began asking Medidata representatives specific questions about Medidata's product offerings—questions that demonstrated knowledge of Medidata's Trade Secrets and confidential information such as would only be known to Medidata employees with extensive exposure to and familiarity with Medidata's product offerings. When Medidata's representatives inquired as to the source of these questions, and in particular why such questions had never been raised before, the responses were uniform: Veeva had planted the questions and encouraged the third parties to ask them of Medidata. As the most recent example, Medidata representatives received such inquiries, along with confirmation that the inquiries had originated with Veeva, at the 2017 J.P. Morgan Healthcare Conference held in San Francisco on January 9–13, 2017.

131.  Upon information and belief, Veeva developed and marketed, and has continued to develop and market, its CTMS and EDC products in New York. According to Veeva's website, as of September 11, 2017, Veeva was recruiting employees to work in New York City in roles directly related to those products, namely, "Account Executive – Vault EDC & eSource," "Managed Services Consultant (Vault)," and "Senior Consultant (Vault)." A true and correct copy

of those job postings from Veeva's website, last accessed on September 11, 2017, is attached hereto as Exhibit W.

132.    Medidata and Veeva compete for customers in the same industry, including customers located in New York.  Upon information and belief, Veeva is using Medidata's Trade Secrets and confidential information to target Medidata's existing CTMS customers, including those that employ Veeva' CRM Product.

133.    Upon information and belief, without access to Medidata's Trade Secrets and confidential information, Veeva would not have been able to develop its own CTMS and EDC products in such a short timeframe.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836)

134.    Medidata incorporates paragraphs 1 through 133 of its Complaint as if fully set forth herein.

135.    Medidata is the owner of the Trade Secrets contained in and relating to its clinical trial software solutions.  These Trade Secrets are related to Medidata's products and services that are used in or intended for use in interstate or foreign commerce.  Medidata sells its software solutions throughout the United States.

136.    Medidata's employees and former employees, including the Former Employees, were in possession of the foregoing Trade Secrets and subject to Confidentiality and Non-Compete Agreements in which they (1) expressly acknowledged and confirmed the confidential nature of these Trade Secrets; (2) agreed to maintain the confidentiality of the Trade Secrets; and (3) agreed not to use the Trade Secrets for their own purposes.

137.    The disclosure by Medidata's employees and former employees, including the Former Employees, of the Trade Secrets to Veeva, as well as their use of the Trade Secrets outside the scope of their employment with Medidata, constitute breaches of the Confidentiality and Non-Compete Agreements.

138.    Medidata's employees and former employees, including the Former Employees, knowingly and improperly used and disclosed such Trade Secrets and confidential information in violation of their duties, including but not limited to those provided in the Confidentiality and Non-Compete Agreements.

139.    Veeva misappropriated the Trade Secrets by knowingly acquiring the Trade Secrets through improper means, namely, by inducing Medidata's employees and former employees, including the Former Employees, to breach their duties to maintain the secrecy of the Trade Secrets.  Veeva also misappropriated the Trade Secrets by disclosing and using the Trade Secrets without Medidata's express or implied consent after knowingly using improper means to acquire knowledge of the Trade Secrets.

140.    Veeva's use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, Veeva knew or had reason to know that its knowledge of the Trade Secrets was derived from or through persons (*e.g.,* the Former Employees) who owed a duty to Medidata to maintain the secrecy, and limit the use of, the Trade Secrets.

141.    Other than through the improper disclosure by the Former Employees or other Medidata employees or former employees, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

142.    Medidata has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be

signed by any party granted access to Medidata's Trade Secrets, requiring the use of passwords, and limiting the access afforded by such passwords based on the nature of each employee's role. These confidential and proprietary Trade Secrets are of substantial economic value and have conferred a competitive advantage on Medidata.

143.    Veeva has and will continue to misappropriate Medidata's Trade Secrets by using these Trade Secrets, without authority, including in Vault CTMS and Vault EDC.  By so doing, Veeva has used Medidata's proprietary Trade Secrets without permission and in violation of the confidentiality obligations of Medidata's employees and former employees, including the Former Employees.

144.    Veeva's misappropriation comprises acts, including without limitation use of Medidata's Trade Secrets, on or after the date of the enactment of the Defend Trade Secrets Act.

145.    Veeva's current and continued misappropriation of Medidata's Trade Secrets is reckless and malicious.  Veeva knows of the confidentiality, ownership, and use restrictions on the Trade Secrets, which Medidata's employees and former employees, including the Former Employees, agreed to abide by in signing their Confidentiality and Non-Compete Agreements.

146.    As a result of Veeva's current and continued misappropriation of Medidata's Trade Secrets, Medidata will suffer imminent and irreparable harm.

147.    Medidata has no adequate remedy at law.  Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Medidata will continue to suffer irreparable harm.

## COUNT II
### Misappropriation of Trade Secrets (New York Law)

148.    Medidata incorporates paragraphs 1 through 147 of its Complaint as if fully set forth herein.

149.    Medidata is the owner of certain valuable Trade Secrets contained in and relating to Medidata's clinical trial software solutions.  These Trade Secrets are for continuous use in the operation of Medidata's business.

150.    Medidata's employees and former employees, including the Former Employees, were in possession of the foregoing Medidata Trade Secrets subject to Confidentiality and Non-Compete Agreements in which they expressly acknowledged and confirmed the confidential nature of these trade secrets.

151.    The disclosures by Medidata's employees and former employees, including the Former Employees, of the Trade Secrets to Veeva, as well as their use of the Trade Secrets outside the scope of their employment with Medidata, constitute breaches of the Confidentiality and Non-Compete Agreements.

152.    Veeva used the Trade Secrets as a result of discovery by improper means, namely, by inducing Medidata's employees and former employees, including the Former Employees, to disclose and use the Trade Secrets in violation of their obligations under the Confidentiality and Non-Compete Agreements.

153.    Other than through the improper disclosure by the Former Employees or other Medidata employees or former employees, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

154.    Medidata has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Medidata's Trade Secrets.  These confidential and proprietary Trade Secrets are of substantial economic value and have conferred a competitive advantage on Medidata.

155. Veeva has and will continue to misappropriate Medidata's Trade Secrets by using these Trade Secrets, without license or authorization, including in Vault CTMS and Vault EDC. By so doing, Veeva has used Medidata's proprietary Trade Secrets without permission and in violation of the confidentiality obligations of the Former Employees or other Medidata employees or former employees.

156. Veeva's current and continued misappropriation of Medidata's Trade Secrets is reckless and malicious.  Veeva knows of the confidentiality, ownership, and use restrictions on the Trade Secrets, which Medidata's employees and former employees, including the Former Employees, agreed to abide by in signing their Confidentiality and Non-Compete Agreements.

157. As a result of Veeva's current and continued misappropriation of Medidata's Trade Secrets, Medidata will suffer imminent and irreparable harm.

158. Medidata has no adequate remedy at law.  Unless enjoined by this Court, Veeva's acts of misappropriation will continue and Medidata will continue to suffer irreparable harm.

### COUNT III
### Tortious Interference with Contractual Relations (New York Law)

159. Medidata incorporates paragraphs 1 through 158 of its Complaint as if fully set forth herein.

160. As discussed above, Medidata and its employees and former employees, including each of the Former Employees, have entered into contracts containing confidentiality and use restrictions prohibiting the disclosure of Medidata's confidential information and Trade Secrets, as well as non-competition and non-solicitation restrictions.

161. Medidata fulfilled all of its obligations pursuant to those agreements.

162. Veeva is aware of those agreements and the obligations they imposed on Medidata's employees and former employees, including the Former Employees.

163.    Although Medidata's employees and former employees, including the Former Employees, each agreed to be bound by their Confidentiality and Non-Competition Agreements, Veeva has intentionally induced, and continues to intentionally induce, Medidata's employees and former employees, including the Former Employees, to breach each of their contractual responsibilities by inducing them to disclose and use Medidata's technology and Trade Secrets for purposes expressly prohibited by those agreements, including using them to facilitate and expedite Veeva's development of directly competing products.

164.    Veeva also has intentionally induced, and continues to intentionally induce, Medidata's employees and former employees, including the Former Employees, to breach their contractual and fiduciary obligations to Medidata by inducing them to (a) enter into Veeva's employ in violation of their Confidentiality and Non-Competition Agreements and (b) encourage other Medidata employees to likewise breach their contractual and fiduciary obligations in violation of their contractual agreements with and fiduciary obligations to Medidata.

165.    Veeva's actions in inducing these breaches of contract were and are without justification, intentional and illegal, and have been engaged in for the specific purpose of inducing Medidata's employees and former employees, including the Former Employees, to breach their agreements with Medidata.

166.    As a proximate result of Veeva's tortious interference with contractual relations, Medidata has been damaged, and Veeva has been unjustly enriched, in an amount to be determined at trial.

## COUNT IV
### Unfair Competition (New York Law)

167.    Medidata incorporates paragraphs 1 through 166 of its Complaint as if fully set forth herein.

168.     Medidata devoted substantial amounts of time, effort, money, talent, and creativity to the development of its Trade Secrets.  Medidata has taken reasonable steps to maintain the secrecy of the Trade Secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Medidata's Trade Secrets.  These confidential and proprietary Trade Secrets, which belong exclusively to Medidata, are of substantial economic value and have conferred a competitive advantage on Medidata.

169.     Medidata likewise utilizes non-competition and non-solicitation agreements with its employees and former employees, including the Former Employees, to protect its investment of time, energy, and resources into its employees.

170.     Veeva has induced Medidata employees and former employees, including the Former Employees, to disclose to it, in violation of their contractual and fiduciary obligations to Medidata, Medidata's Trade Secrets and other confidential and proprietary information.

171.     Veeva also has misappropriated Medidata's property (*i.e.*, Medidata's Trade Secrets and other confidential and proprietary information), which Medidata uses to provide technology solutions and services for clinical research and trials, to accelerate its entry into the market for such solutions and services and enable it to compete with Medidata in that market, which Veeve would otherwise have been unable to do.

172.     Medidata has no adequate remedy at law.  Unless enjoined by this Court, Veeva's acts of unfair competition will continue and Medidata will continue to suffer irreparable harm.

### COUNT V
### Aiding and Abetting Breach of Fiduciary Duties (New York Law)

173.     Medidata incorporates paragraphs 1 through 172 of its Complaint as if fully set forth herein.

174.     Employees and former employees of Medidata, including the Former Employees (each individually), owed and continue to owe fiduciary duties of care, loyalty and good faith to

Medidata.  Their fiduciary duties include but are not limited to obligations to discharge their obligations to Medidata in good faith and maintain the confidentiality of Medidata's confidential and proprietary information.

175.    Upon information and belief, Veeva had actual knowledge of the duties and obligations of Medidata's employees and former employees, including the Former Employees, because Veeva knew that they had previously been employed by Medidata.

176.    Despite its knowledge of their fiduciary duties and obligations, Veeva has knowingly induced Medidata's employees and former employees, including the Former Employees, to breach their fiduciary duties of care, loyalty and good faith to Medidata and participated in those breaches by, among other things, encouraging them to breach their non-competition and non-solicitation agreements.

177.    Veeva also has knowingly induced Medidata's employees and former employees, including the Former Employees, to breach their fiduciary duties of care, loyalty, and good faith to Medidata and participated in those breaches by disclosing and using Medidata's technology and Trade Secrets on behalf of Veeva.

178.    Veeva's actions in aiding and abetting these breaches of fiduciary duty were and are intentional, illegal and have been engaged in for the specific purpose of aiding and abetting Medidata's employees and former employees, including the Former Employees, to breach their fiduciary duties to Medidata.

179.    As a proximate result of Veeva's aiding and abetting of breach of fiduciary duties, Medidata has been damaged, and Veeva has been unjustly enriched, in an amount to be determined at trial.

## COUNT VI
## Unjust Enrichment (New York Law)

180.    Medidata incorporates paragraphs 1 through 179 of its Complaint as if fully set forth herein.

181.    Veeva has been enriched and has benefitted from its use of Medidata's Trade Secrets by, for example, accelerating development of Veeva's own competing product and gaining an unfair commercial advantage over Medidata.

182.    Veeva has been enriched at Medidata's expense, as Medidata has devoted substantial amounts of time, effort, money, talent, and creativity to the development of its property, including its confidential information and Trade Secrets.

183.    Veeva knew that targeting Medidata's employees and former employees, including the Former Employees, and inducing them to disclose Medidata's Trade Secrets and other confidential information would harm Medidata.

184.    Given Veeva's inequitable misconduct, including its intentional and knowing misappropriation of Medidata's property and confidential information, including its Trade Secrets, for the purpose of exploiting and utilizing the Trade Secrets for Veeva's own financial benefit, equity and good conscience require restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court:

A.    Find that Veeva has misappropriated Medidata's Trade Secrets;

B.    Find that Veeva has tortiously interfered with Medidata's agreements with its employees and former employees, including the Former Employees;

C.    Find that Veeva has engaged in unfair competition;

D.      Find that Veeva has aided and abetted the breach by Medidata's employees and former employees, including the Former Employees, of their fiduciary duties to Medidata;

E.      Find that Veeva has unjustly enriched itself at Medidata's expense;

F.      Issue an injunction enjoining Veeva and its agents, servants, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in concert with it, from:

      1.      inducing any current or former employees of Medidata to disclose any of Medidata's Trade Secrets;

      2.      making any use whatsoever of any of Medidata's Trade Secrets; or

      3.      interfering with the Confidentiality and Non-Compete Agreements between Medidata and any of its current or former employees.

G.      Order Veeva to take affirmative actions to protect Medidata's Trade Secrets, including without limitation a seizure of all documents or information in Veeva's possession that concerns or relates to Medidata's Trade Secrets;

H.      Award Medidata monetary damages, both compensatory and punitive, as a result of each cause of action against Veeva, including but not limited to damages as a result of Veeva's misappropriation of Medidata's trade secrets; Veeva's interference with Medidata's contractual relations; Veeva's unfair competition; Veeva's aiding and abetting the breach by Medidata's employees and former employees, including the Former Employees, of their fiduciary duties to Medidata; and Veeva's unjust enrichment, all in amounts to be determined at trial, plus interest;

I.      Award Medidata all expenses for this action, including costs and fees; and

J.      Award such other and further relief as the Court may deem just and proper.

Dated:  September 20, 2017                    */s/ Claudia Ray*
                                             Claudia Ray
                                             claudia.ray@kirkland.com
                                             Yosef J. Riemer
                                             yosef.riemer@kirkland.com
                                             Joseph A. Loy
                                             joseph.loy@kirkland.com
                                             KIRKLAND & ELLIS LLP
                                             601 Lexington Avenue
                                             New York, NY 10022
                                             Tel: (212) 446-4800
                                             Fax: (212) 446-4900

                                             *Attorneys for Plaintiffs Medidata Solutions, Inc.*
                                             *and MDSOL Europe Limited*