UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MEDIDATA SOLUTION, INC., et al.,             :
                                    Plaintiffs,    :
                                                   :
            -against-                              :            17 Civ. 589 (LGS)
                                                   :
VEEVA SYSTEMS, INC.,                        :            OPINION & ORDER
                                    Defendant.  :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

Plaintiffs Medidata Solutions, Inc. and MDSOL Europe Limited (together, "Medidata")

allege that Veeva Systems, Inc. ("Veeva") violated the Defend Trade Secrets Act ("DTSA") and

New York's prohibition on the misappropriation of trade secrets (Counts I, II). Medidata also

alleges four claims under New York common law -- that Veeva engaged in tortious interference

and unfair competition (Counts III, IV) and that Veeva aided and abetted its employees' breach

of their fiduciary duties and was unjustly enriched (Counts V, VI). Veeva asserts sixteen

affirmative defenses.

Medidata has filed a motion for summary judgment on Counts I and II and Veeva's

affirmative defenses of equitable estoppel and waiver. Veeva has filed a cross-motion for

summary judgment on Counts I through VI. For the reasons stated below, each motion is

granted in part and denied in part.

## I. BACKGROUND

Medidata is a New York company that sells software for clinical trials, including two

products, "Electronic Data Capture" ("EDC") and "Clinical Trial Management System"

("CTMS") software. EDC software is used to collect and store clinical trial data. CTMS

software is used to manage clinical trials.

Medidata claims it has created and maintains trade secrets related to and embodied in its EDC product called "Rave" EDC.  Medidata broadly contends such trade secrets comprise certain information about the EDC product's (1) platform and integration concepts, (2) software architecture design processes and principles, (3) development and planning strategies, (4) customer-specific EDC product development information and (5) EDC product development implementation information (collectively, the "EDC Trade Secrets").  Medidata claims it has created and maintains the same categories of trade secrets for its CTMS product (collectively, the "CTMS Trade Secrets").

Medidata also claims that it has created and maintains trade secrets related to its business planning, marketing and sale of the EDC and CTMS products.  Broadly, Medidata contends such trade secrets consist of certain (1) client solutions footprints, (2) sales information, (3) pricing information, (4) sales team training materials, (5) overall business plans and (6) go-to-market strategies for the EDC and CTMS products (collectively, the "Business Trade Secrets").

Veeva is a California company that also sells EDC and CTMS products.  Upon entering the clinical trial software market, Veeva hired several former Medidata employees who helped develop Veeva's EDC and CTMS products.  Medidata claims that in doing so, Veeva misappropriated the EDC, CTMS and Business Trade Secrets (collectively, the "Trade Secrets").  Medidata relies on circumstantial evidence, direct evidence and expert testimony to prove misappropriation.

## II.   STANDARD

When parties cross-move for summary judgment, a court must analyze the motions separately, "in each case construing the evidence in the light most favorable to the non-moving party."  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  Summary judgment is

appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019).  "Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013); *accord Starr Indemnity & Liability Company v. Brightstar Corp.*, 388 F. Supp. 3d 304, 323 (S.D.N.Y. 2019), *aff'd,* 828 F. App'x 84 (2d Cir. 2020).

## III.   DISCUSSION

The parties' cross-motions on the trade secrets claims of Counts I and II are granted in part and denied in part.  Medidata sufficiently describes and provides evidentiary support for ten of the sixteen classes of Trade Secrets -- thus creating issues of fact precluding summary judgment for Veeva.  Both parties raise triable fact issues as to whether those ten classes of Trade Secrets are valuable, protected and misappropriated.

Veeva's motion for summary judgment on Counts III through VI is granted, as those claims are preempted under controlling state law.  Medidata's motion for summary judgment on Veeva's affirmative defenses of waiver and equitable estoppel is granted.

### A.  The Trade Secrets Claims (Counts I and II)

Under New York law,[1] "[a] plaintiff claiming misappropriation of a trade secret must prove that: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E. 3d 301, 310 (N.Y. 2018); *accord Cont'l Indus. Group, Inc. v. Altunkilic*, 788 F. App'x 37, 40 (2d Cir. 2019) (summary order).  The federal Defend Trade Secrets Act ("DTSA") similarly requires proving misappropriation of a trade secret either by acquisition of the trade secret through improper means or disclosure or use of the trade secret without consent.  *See Medidata Sols., Inc. v. Veeva Sys. Inc.*, No. 17 Civ. 589, 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018); *accord AUA Private Equity Partners, LLC v. Soto*, No. 17 Civ. 8035, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018) *see also* 18 U.S.C. §§ 1831–39.  As the requirements are similar under the DTSA and New York law, courts often rely on cases discussing New York law to analyze DTSA claims.  *See, e.g.*, *Elsevier Inc. v. Doctor*

---

[1] The parties dispute whether New York or California's trade secret law applies to Count II. Federal courts use the forum state's choice-of-law rule.  *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001); *accord Kashef v. BNP Paribas SA*, No. 16 Civ. 3228, 2020 WL 1047573, at *4 (S.D.N.Y. Mar. 3, 2020).  New York's choice-of-law rule first asks if an "actual conflict" is present and then which jurisdiction has a greater interest in the dispute. *See AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 n.11 (2d Cir. 2018); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157-58 (2d Cir. 2012).

An actual conflict arises where the law of each jurisdiction "provides different substantive rules," and the differences are "relevant" and have a "significant possible effect on the outcome of the trial," although they need not lead to different outcomes.  *Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin. Inc.*, 414 F.3d 325, 331–32 (2d Cir. 2005); *accord Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (summary order).  The parties agree that the elements of a misappropriation claim are substantively the same under the DTSA/New York law and the California Uniform Trade Secrets Act, and that there is no actual conflict between misappropriation claims under these bodies of law.  Because there is no actual conflict, and because the parties' briefs apply New York and federal law to the question of misappropriation, the Court does the same.  *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (applying substantive body of law briefed by the parties); *accord Zigler v. Featherstone Foods, Inc.*, No. 20 Civ. 2462, 2021 WL 149259, at *3 n.2 (S.D.N.Y. Jan. 15, 2021).

*Evidence, LLC*, No. 17 Civ. 5540, 2018 WL 557906, at \*3 (S.D.N.Y. Jan. 23, 2018); *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 461–62 (S.D.N.Y. 2017); *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016).

### 1. Whether Medidata Sufficiently Describes the Trade Secrets

Under New York law, a trade secret is "any formula, pattern, device or compilation of information" that the owner uses in its business and that affords it an advantage over competitors who do not know or use it. *E.J. Brooks Co.*, 105 N.E. 3d at 310. The DTSA defines trade secrets as "all forms and types" of information that the owner takes "reasonable measures to keep . . . secret" and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person." 18 U.S.C. § 1839(3). "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Integrated Cash Mgmt. Servs, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (quotation omitted); *accord Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 Fed. App'x 46, 48 (2d Cir. 2018) (summary order). To survive summary judgment, a plaintiff asserting trade secret misappropriation must provide credible evidence that the trade secret exists and is ascertainable. *See Next*, 758 Fed. App'x at 49–50.

Veeva's primary argument for summary judgment is that Medidata's descriptions of the Trade Secrets are insufficiently specific for a reasonable jury to understand what the claimed Trade Secrets are and render a decision on misappropriation. The Second Circuit has not "squarely articulated the precise contours of [this] specificity requirement in the context of trade secrets." *Next Commc'ns, Inc.*, 758 F. App'x at 49 n.3. However, courts in this district require a

trade secret to be described specifically enough "that the defendant can defend [itself] adequately against claims of trade secret misappropriation, and can divine the line between secret and non-secret information, and so that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 5 Civ. 9292, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008); *accord Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 263 (S.D.N.Y. 2014), *aff'd sub nom. Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015).

Put differently, to survive summary judgment, a plaintiff's trade secret must be described specifically enough for a jury to apply the relevant legal tests -- whether a trade secret existed and whether the defendant misappropriated it. When the plaintiff's description of its trade secret, based on "cit[ations] to particular parts of materials in the record," *see* Fed R. Civ. P. 56(c)(1)(A), allows a reasonable juror to determine whether the defendant protected a valuable secret, and could allow her to determine whether the defendant misappropriated that secret, summary judgment is improper. However, if the plaintiff's description of the trade secret is so "vague and ambiguous" that no reasonable juror could possibly determine whether one of the elements of the cause of action is satisfied, a defendant should be granted summary judgment. *See Sit-Up Ltd.*, 2008 WL 463884, at *11. That occurs when a juror cannot reasonably distinguish protected information that the trade secret encompasses and unprotected information that it does not. *See id.* (a juror must be able to "divine the line between secret and non-secret information"); *see also Big Vision Private Ltd.*, 1 F. Supp. 3d at 265 (holding two laboratory papers did not describe a trade secret formula when they described "a wide variety" of formulae for creating recyclable banners); *PaySys Int'l, Inc. v. Atos Se*, No. 14 Civ. 10105, 2016 WL 7116132, at *11 (S.D.N.Y. Dec. 5, 2016) (an undefined subset of "a million lines of code written

thirty years ago," only some of which remains secret, is not a trade secret); *Next Commc'ns, Inc.*, 758 F. App'x at 50 ("[B]ecause [the plaintiff] did not define the contours of the [trade secret software architecture], a court cannot determine what exactly the [trade secret] encompasses.").

Medidata has resisted specifically defining the Trade Secrets, instead propounding voluminous and imprecise responses to Veeva's interrogatory requests seeking the identity of the Trade Secrets.  Judge Lehrburger twice required Medidata to narrow its discovery responses purporting to identify the Trade Secrets.  In his second Order, Judge Lehrburger admonished Medidata that "failure to sufficiently identify the alleged trade secrets with specificity during discovery [will] have consequences on summary judgment . . . and [Medidata will] be bound by the answers given during discovery even if not sufficiently specific."  In assessing whether Medidata has adequately defined the Trade Secrets, the Court will credit only sufficiently specific descriptions of each Trade Secret in Medidata's discovery responses, supported by admissible record evidence.

In response to Judge Lehrburger's second Order, Medidata narrowed its answer to Veeva's interrogatory request that Medidata "[d]escribe in detail each alleged MEDIDATA trade secret that YOU allege was misappropriated by VEEVA," offering a seventy page "complete narrative description" of the sixteen Trade Secrets (the "Response").  The Response is far from clear or precise.[2]  Nonetheless, it can be reasonably construed to describe with adequate

---

[2] Veeva argues that the Response is unverified and therefore cannot be relied on to describe any evidence.  That argument is unpersuasive, as Medidata has introduced declarations verifying that the Response contains true and accurate information.  Veeva has filed a motion to strike these declarations.  Even if the Court were to grant the motion to strike, the Response would still be admissible because the declarants verified the accuracy and completeness of the material in the Response at depositions and are presumably available to do the same at trial.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (affidavit may be considered at trial where evidence therein is admissible "when presented at trial in the form of testimony or other permissible method").

specificity and support with direct and circumstantial evidence (construed in Medidata's favor as the non-moving party) ten of the sixteen classes of Trade Secrets as explained below. *See* Fed R. Civ. P. 56(c)(1)(A). The specific Trade Secrets within each class for which Medidata provides a sufficiently specific description are set forth in Appendix A to this Opinion.

### i.   The EDC Trade Secrets

The five classes of EDC Trade Secrets include aspects of the EDC software product and the processes Medidata uses to develop that product. Software programs are protectable as trade secrets, *see Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 515 (S.D.N.Y. 2017), as are processes to develop software, *see Integrated Cash Mgmt. Servs, Inc.*, 920 F.2d at 174. The question on this motion is whether a reasonable juror could evaluate Medidata's descriptions of these trade secrets to determine whether descriptions and embodiments of such technology were valuable, protected by Medidata and misappropriated by Veeva.

Medidata's first class of EDC Trade Secrets includes "platform design and integration technology" for the EDC product. Medidata first references "proprietary technology that it has used to achieve the optimal integration" of its product with other products, as well as between various enumerated add-on software modules to the EDC product. To the extent Medidata asserts that there is some "proprietary technology" that permits some unspecified module in its EDC product to integrate with other modules or systems, its assertion lacks specificity, as no reasonable juror could evaluate the record evidence to determine what specific interoperability functionality is at issue. Nor would Veeva have notice of such functionality. *See Sit Up*, 2008 WL 463884, at *11 ("specificity is required before the court so that the defendant can defend himself adequately against claims of trade secret misappropriation").

Medidata specifically identifies one piece of software for which it has enabled

interoperability as well as ten add-on modules for which it has enhanced interoperability. Medidata also references a specific messaging technology it developed to "further enhance the stability of integration."  Medidata supports these trade secrets with excerpts from a product manual explaining that the EDC software is designed to integrate with other software.  The descriptions of these twelve items are sufficiently specific with respect to "integration technology" for a reasonable juror to evaluate the record evidence to determine if some asserted secret relating to interoperability involved these items.

Medidata next references the overall software architecture of its EDC product as falling under its "platform design and integration technology" Trade Secrets.  Medidata's description of this item is supported by a diagram showing the breakdown of the EDC software into various internal modules, as well as the interrelations and dataflows between those modules.  Because a reasonable juror could evaluate an item of record evidence to determine whether it relates to integration between such modules, and from there determine whether that information qualifies as a trade secret and was misappropriated, Medidata sufficiently specifies a trade secret only for "platform design and integration technology" enabling integration between the modules enumerated on its referenced diagram.[3]

Medidata's second class of EDC Trade Secrets encompasses the "software architecture design processes and principles" it uses to develop its EDC product.  More explicitly, Medidata references seven specific and allegedly proprietary software design principles it uses to ensure the EDC product meets customer needs.[4]  Medidata supports this description by referencing a

---

[3] *See* Appendix A § 1.a

[4] It is not possible for a juror to tell whether an alleged trade secret involves one of these principles, as the materials Medidata references provide no indication of what the terms mean beyond their names.  It is thus unlikely that Medidata would be able to prove that these architectural principles, standing alone, were proprietary or maintained as secrets.  Regardless, Medidata provides no record evidence showing these items were present in the EDC product.

presentation listing the names of these design principles in connection with the "Medidata Clinical Cloud," coupled with block diagrams describing certain functionality in the EDC product.  Medidata's block diagrams -- which relate to the EDC product, unlike the cited presentation -- do not contain any reference to the asserted architectural principles.  Nor does Medidata provide any explanation of how its cited block diagrams relate to those principles, but instead only describes the benefits those principles bring to the EDC product.  As to the presentation, even if it did relate to the EDC product, it contains only unexplained vague and abstract labels, some of which relate to the asserted architectural principles.  *See Next Commc'ns, Inc.*, 758 F. App'x at 49 (stating that presentation slides that rely on "vague labels, rudimentary graphics, and high-level concepts" does not convey information about what the trade secret actually is).  Construing the evidence in the light most favorable to Medidata, no reasonable juror could ascertain whether one of these vaguely-delineated design principles is present in the EDC product, let alone maintained as a secret and misappropriated.  Accordingly, Medidata fails to describe these trade secrets with sufficient specificity.

Medidata's third class of EDC Trade Secrets is its "product development planning strategies," specifically, its "strategies for developing and planning its EDC SaaS products, including its roadmaps and timelines for product development."  Medidata describes these trade secrets as including "technical details of future releases" and enumerates thirteen specific improvements and new features to the EDC product that "enhance[] the user interface, CRF [Case Report Form] design, and data management functionality of [Medidata's] EDC products" and "reduce the amount of time it takes to get a study up and running, minimize the amount of downtime and manual effort needed to complete upgrades, and improve data exchange with third-party systems."  Medidata further describes eight specific new product features "that would

allow it to address unmet customer needs and potential opportunities in the EDC market."  In support of these asserted secrets, Medidata cites slides from a presentation identifying customer concerns and issues and describing how Medidata responded to those concerns, as well as proprietary product roadmap documents outlining technical details of upcoming features. Because Medidata points to particular product features as well as documentation discussing information relevant to nineteen of those features, a reasonable juror could apply the relevant legal standards to those features.  Accordingly, Medidata has identified this class of trade secrets with sufficient specificity as to only those nineteen features enumerated in the Response and set forth in Appendix A.[5]

Medidata's fourth class of EDC Trade Secrets comprises "customer-specific product development information," specifically, "information regarding Medidata's implementation of new features and functionalities, including confidential plans, projects, mock-ups, prototypes, and demonstration versions reflecting new features and functionalities."  Medidata supports these trade secrets by referencing a slide which states "R&D."  Because Medidata does not specifically identify or explain which confidential plans, projects, mock-ups, prototypes and demonstration versions reflecting new features and functionalities are at issue with specific citations to record evidence, no reasonable juror could ascertain the line between what Medidata is asserting to be a trade secret and what it is not.  Accordingly, Medidata does not identify this class of trade secrets with adequate specificity.

Medidata's fifth class of EDC Trade Secrets comprises its "product development implementation information," specifically, "the granular and functional operation of Medidata's Rave EDC product line, as well as the architecture and technology fabric underlying those

---

[5] *See* Appendix A § 1.c.

components."  Medidata cites several examples of this "proprietary technology," including its "application programming interface ('API'), which enables integration of a third-party clinical system with an EDC feature," and "proprietary technology that enables inbound and outbound data flow" for a variety of data types.  Medidata also references "proprietary technology that enables outbound integration" underlying its "Rave Data Exporter," "Rave Status Exporter," and "SAS on Demand" features.  Medidata also references "proprietary technology that enables inbound integration" underlying its "Batch Uploader," "Architect Loader," and "ODM Metadata Importer."  Finally, Medidata references "features of the Rave client and user interface," including development features of the EDC product client that enable it to be readily accessed by users.

This class of trade secrets overlaps with Medidata's first class of EDC Trade Secrets comprising "platform design and integration technology."  As with the "platform design and integration technology" Trade Secrets, Medidata sufficiently describes proprietary integration technology relating to six specific product features:  the "Rave Data Exporter," "Rave Status Exporter," "SAS On Demand," "Batch Uploader," "Architect Loader" and "ODM Metadata Importer."  Medidata supports these descriptions with product manuals describing interoperability functionality relating to these features.  Accordingly, Medidata has sufficiently specified trade secrets with respect to "integration technology" for these six items, as a reasonable juror could evaluate the record evidence to determine if an asserted piece of confidential and misappropriated information relating to interoperability involved these items.

Medidata's reference to the "features of the Rave client and user interface" is unduly vague, except as to the two specific features Medidata describes in the Response related to

accessibility for the EDC client.[6]  Medidata supports these alleged trade secrets by referencing a demonstration manual describing these features.

Medidata does not sufficiently describe a trade secret with respect to the EDC product API, as Medidata provides no explicit description of API features and functionality that are protected.  Medidata's reference to "proprietary technology that enables inbound and outbound data flow" for various data types is unduly vague, as no reasonable juror could understand which specific integration technology is at issue.  Medidata's reference to the "architecture and technological fabric underlying" the "granular and functional operation of Medidata's Rave EDC product line" provides no detail regarding specific product components or functionalities at issue.  Medidata fails to specify trade secrets as to these items.[7]

### ii. The CTMS Trade Secrets

As with the EDC Trade Secrets, the five classes of CTMS Trade Secrets include the CTMS software product and the processes that Medidata uses to develop and market that product.

Medidata's first class of CTMS Trade Secrets comprises "platform design and integration concepts" for the CTMS product.  Medidata describes these trade secrets as "including processes and data flows necessary to enable a CTMS product to act as a source or consumer of master data in a clinical trial software platform" and as "an overarching plan for integrating its products and modules into a unified platform for clinical trials . . . ."  Medidata then describes ten categories of implementation efforts, two of which received proprietary code names, that it undertook to achieve its integration objectives.  Rather than explicitly identify product modules

---

[6] *See* Appendix A § 1.e.
[7] *See* Appendix A § 1.e.

or particularized functionalities, Medidata makes vague references to (1) "master records and core object services," (2) "tools for the management of" a wide variety of data sets, (3) "shared data and workflows connecting and combining" a variety of general study information, (4) "optimization of data flows through the clinical trial management system," including generic examples of such functionality, (5) "utilization of structured data" to meet objectives, (6) "procedure- and rule-based functionality" to handle data, (7) "permit[ting] transparent connections" to other systems, (8) "authorization, administration, and security services" for users, (9) "role-based, data-driven workflows" for users and (10) "design optimization in order to present data in a meaningful and consistent way."[8]  Those efforts are described at too high a level for a reasonable juror to determine what secrets Medidata is asserting, or for Veeva to have notice of what secrets are asserted against it.

Medidata's second class of CTMS Trade Secrets is the "software architecture design processes and principles" it uses to develop its CTMS product.  As with the analogous class of EDC Trade Secrets, Medidata enumerates seven allegedly proprietary software design principles it uses to ensure the CTMS product meets customer needs.  Medidata supports its description by reference to the same documents as the analogous class of EDC Trade Secrets:  block diagrams for the EDC (rather than CTMS) product and a slide presentation containing unexplained vague and abstract labels, some of which match the asserted design principles.  Because Medidata's cited record evidence does not support finding the asserted design principles present in the CTMS product, this class of trade secrets does not survive summary judgment.

---

[8] Medidata's description of each item in this class of trade secrets consists of a generic functionality, and then a clause describing additional product functions or data types implicated by the generic functionality.  However, the follow-on clauses do not meaningfully limit the generic functionality claimed.  Medidata's full descriptions appear to encompass virtually every item of functionality in the CTMS product and are insufficiently specific because they are far too broad for jurors to meaningfully parse.

Medidata's third class of CTMS Trade Secrets comprises its "product development planning strategies," specifically, its "strategies for developing and planning its CTMS SaaS products, including its roadmaps and timelines for product development."  Medidata identifies ten "core functionalities" it sought to address with its initial CTMS product, as well as twenty-seven new features and functionalities it sought to add in later product versions.  In support of these trade secrets, Medidata cites internal product design roadmaps and documentation, as well as presentations outlining certain features.  Rather than generally define high-level product functionality, Medidata points to discrete product features, specific software modules and well-delineated functional elements of the CTMS product.  A reasonable juror could apply the relevant legal standards to those specific features.  Accordingly, Medidata has identified this class of trade secrets with sufficient specificity as to the enumerated features in the Response.  Medidata also makes vague reference to "its strategies and methods for efficient allocation of product management and development resources."  Medidata does not specifically describe such strategies and methods but instead states that those methods permit "alignment" of certain high-level product characteristics with "relevant business objectives."  No reasonable juror could ascertain what specific trade secrets are covered by those high-level statements.[9]

Medidata's fourth class of CTMS Trade Secrets comprises "customer-specific product development information," or "information regarding the development and implementation of customer- and role-specific layouts, portals, workflows, and customer 'user' stories' unique to clinical trials," as well as information regarding "key roles or 'personas' involved in the conduct of clinical trials" that assist Medidata in tailoring its CTMS product to user needs.  Medidata lists ten general improvements to the CTMS product designed to address two insights that it gained

---

[9] *See* Appendix A § 2.c.

from analysis of clinical trial data.  As with the "platform design and integration concept" class of CTMS Trade Secrets, Medidata does not describe or define any of these improvements with sufficient specificity.  Instead, Medidata's descriptions comprise a generic listing of high-level product functionality, leaving jurors unable to differentiate between what is allegedly protected and what is not.

Medidata's fifth class of CTMS Trade Secrets comprises "product development implementation information," regarding "Medidata's implementation of new features and functionalities, including confidential plans, projects, mock-ups, prototypes, and demonstration versions reflecting new proprietary features and functionalities."  Medidata first lists five areas where it has implemented new product features. Those descriptions are insufficiently specific, describing product functionality at too high a level for a reasonable juror to discern what exact product features and functionality are allegedly protected.

Medidata sufficiently describes two additional proprietary improvements it has made to the CTMS product: (1) the implementation of a specific measure to avoid corruption of data due to multiple synchronizations on the same study and (2) a method for organizing various processes in the CTMS product in order to improve throughput and performance.  Medidata cites a confidential internal presentation describing these measures.  A reasonable juror reading Medidata's descriptions of these improvements could discern the boundaries of the trade secrets Medidata is asserting.  Accordingly, Medidata has sufficiently described these two items, but not the other five items it attempts to delineate in the "product development and implementation" class of CTMS Trade Secrets.[10]

---

[10] *See* Appendix A § 2.e.

### iii.    The Business Trade Secrets

The six classes of Business Trade Secrets include the information and processes that Medidata uses to market and sell the EDC and CTMS products.  Data relating to pricing and costs are protectable.  *See In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009); *accord Cont'l Indus. Group, Inc.*, 788 F. App'x at 40–41.  Sales information is protectable, too.  *Free Country Ltd*, 235 F. Supp. 3d at 569.  Information relating to customers is also protectable.  *See N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999); *accord Markets Grp., Inc. v. Oliveira*, No. 18 Civ. 2089, 2020 WL 820654, at *7 (S.D.N.Y. Feb. 3, 2020), *report and recommendation adopted*, No. 18 Civ. 2089, 2020 WL 815732 (S.D.N.Y. Feb. 19, 2020).  Finally, business and marketing information is protectable.  *See Art & Cook, Inc. v. Haber*, 416 F. Supp. 3d 191, 197 (E.D.N.Y. 2017).

Medidata's first class of Business Trade Secrets comprises its "client solutions footprint," which Medidata defines as (1) "information regarding the contract status and contract terms for individual customers" and "information identifying start and end dates for customers' contracts"; (2) "its revenues on a product-by-product basis"; (3) "information relating to product density on a customer-by-customer basis, which shows the particular Medidata solutions Medidata's customers have purchased"; (4) "internal directories containing contact information for key individuals at current and prospective customers" and (5) "specific product requirements for each customer."  To support this description, Medidata introduces internal spreadsheets and analyses. A reasonable juror could ascertain whether a piece of allegedly misappropriated information falls within these categories.[11]

Medidata's second class of Business Trade Secrets comprises "information regarding its

---

[11] *See* Appendix A § 3.a.

sales activities," specifically: (1) its win/loss analyses for past sales; (2) proprietary data describing potential earnings from sales in progress and potential new customers identified as likely sales opportunities; (3) a proprietary sales process it uses with potential customers; (4) its sales quotas by customer and salesperson and (5) its proprietary "value governance process," which it uses to determine the effectiveness of its products for customers.  Evidence supporting these trade secrets is data on past sales efforts, presentations explaining proprietary methodologies and spreadsheets and reports on current and future sales opportunities.  A reasonable juror could evaluate Medidata's description of these items to determine whether Medidata seeks to protect a particular item of sales information as a trade secret.[12]

Medidata's third class of Business Trade Secrets is its "pricing information," which Medidata describes as (1) its proprietary pricing algorithm and (2) prices proposed and actually charged to EDC and CTMS customers.  To support these descriptions, Medidata cites spreadsheets and presentations demonstrating its pricing formula and containing its pricing data.  A reasonable juror could evaluate Medidata's description of these items to determine whether Medidata seeks to protect a particular item of pricing information as a trade secret.[13]

Medidata's fourth class of Business Trade Secrets comprises its "sales team training materials," which Medidata claims it uses to train its salespeople to "(1) articulate the value of its CTMS and EDC products, (2) present its solutions in the best light, (3) differentiate Medidata's position in the market, and (4) map Medidata's solutions to the specific business needs of existing and potential customers."  In support of this class of trade secrets, Medidata cites a presentation given to its sales team annually describing market analyses and projections, upcoming product lineups and sales strategies.  A reasonable juror could evaluate an item of

---

[12] *See* Appendix A § 3.b.
[13] *See* Appendix A § 3.c.

sales training material to determine if it could be used in instructing a salesperson in one of Medidata's four enumerated categories of sales performance.[14]

Medidata's fifth class of Business Trade Secrets comprises its "overall business plans," which Medidata describes as "information reflecting its company-wide business plans for marketing its CTMS and EDC products . . . including marketing strategies, platform design plan, go-to-market strategy, pricing information, sales opportunities and challenges, and product sales strategies."  In support of these trade secrets, Medidata cites product business plans for the EDC and CTMS products.  These enumerated categories of information are broad and undefined by Medidata.  As such, no reasonable juror could discern from Medidata's description what specific items relating to Medidata's "overall business plans" constitute the claimed secrets.  Also, these broad categories of information encompass more specifically-described data in the other classes of Business Trade Secrets, as well as the EDC and CTMS trade secrets.  As such, they are duplicative of already-asserted trade secrets, albeit unduly broader in scope.

Medidata's sixth class of Business Trade Secrets comprises its "go-to-market strategy," which Medidata defines as specific items it uses to bring products to market:  (1) information reflecting the size of potential markets for its products; (2) the processes and data it uses to assess growth targets for products; (3) internal and market information for specific geographic regions and (4) customer feedback, market share and lost sales information, which it uses to assess its competitive positioning against rival products in various markets.  The evidence supporting these trade secrets includes data on relevant markets, product performance and competitors as well as slides describing principles the company follows to determine how to bring products to market.  Because Medidata describes discrete categories of proprietary data and

---

[14] *See* Appendix A § 3.d.

well-delineated processes, it has sufficiently specified these trade secrets.[15]

### iv.    Other Support for the Trade Secrets

Medidata argues that two additional interrogatory responses and the report of its expert also describe and support the trade secrets and should be used to supplement the description set forth in Response.  The Court relies only on the Response, and the admissible record evidence specifically cited therein, to identify the Trade Secrets, consistent with (1) Judge Lehrburger's admonition, in directing more specific interrogatory answers, that "failure to sufficiently identify the alleged trade secrets with specificity during discovery [will] have consequences on summary judgment . . . and [Medidata will] be bound by the answers given during discovery even if not sufficiently specific" and (2) the Response's statement that it "[d]escribes . . . each alleged . . . trade secret," its inclusion of a "complete narrative description" of the Trade Secrets and its citations to specific evidentiary material to support the Trade Secret descriptions.

The additional interrogatory responses that Medidata puts forward are not specific, but instead list thousands of documents.  It is neither Veeva nor the Court's burden to ascertain whether any identifiable trade secret evidence can be gleaned from tens of thousands of pages of documentation.  *See Big Vision Private Ltd.*, 1 F. Supp. 3d at 263 (the plaintiff "impermissibly shift[ed] its burden onto [the defendant] (and the Court)" where it stated that the trade secret description could be ascertained through "70 pages of abstruse laboratory papers").  Similarly, Medidata offers only one specific point in its expert's report -- which was prepared for purposes of determining trade secret value and misappropriation, not trade secret definition -- purporting to identify with specificity the "software architecture design processes and principles" EDC Trade Secret.  The cited portion of that report does not lend any specificity, instead stating that

---

[15] *See* Appendix A § 3.f.

Medidata developed a proprietary data model that assists in ensuring the EDC product functions optimally, such as a "collection of interrelated schemas, data points and explanations for successfully implementing a solution for the representation of clinical trial data" and a variety of other high-level EDC product functionality.  Medidata's reliance on the expert report does not lend any specificity to the related trade secret definition.  Although Medidata briefly states that its expert offered equally detailed explanations of the other EDC and CTMS Trade Secrets across that report's 360 pages, it does not make any specific reference to such descriptions.

### 2.  Whether Medidata's Trade Secrets are Valuable and Protected

A cognizable trade secret is entitled to protection only if it is both valuable and protected. *E.J. Brooks Co.*, 105 N.E. 3d at 310; 18 U.S.C. § 1839(3).  The Second Circuit directs courts to use a six-factor test, first stated in *N. Atl. Instruments*, 188 F.3d, to make this determination. Courts consider:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be proposed acquired or duplicated by other means.

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *Haber*, 188 F.3d at 43–44); *accord Cont'l Indus. Group, Inc.*, 788 F. App'x at 40.  "[T]he most important consideration [is] whether the information was secret."  *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986); *accord Broker Genius*, 280 F. Supp. 3d at 514.

Disputes of material fact exist as to whether the remaining Trade Secrets are valuable and protected.  Therefore, all of them survive summary judgment at this stage.

As to protection, Medidata cites evidence that it implements procedural, technical and

physical measures to safeguard each Trade Secret.  Veeva does not dispute that Medidata has

taken these measures generally, but cites evidence purportedly showing that Medidata has made

public certain information falling within the contours of the Trade Secrets.  Because a reasonable

juror could find for either party, summary judgment on the question of trade secret protection is

not warranted.

As to value, Medidata states that it invested significant time and effort in developing the

Trade Secrets, and that those secrets are valuable to competitors seeking to build similar

products.  Veeva disputes these assertions, claiming that (1) Medidata's cited evidence of trade

secret value -- software development logs, financial expenditures on product development and

expert opinion -- is not limited to the Trade Secrets, (2) Medidata's witness testimony on value is

not based on personal knowledge and (3) competitors would not benefit from the Trade Secrets -

- particularly Veeva, whose products are built on an unrelated proprietary platform.  A

reasonable juror weighing the evidence of Trade Secret value could find for either party.  As

such, summary judgment on the question of trade secret value is not warranted.

### 3.  Whether Veeva Misappropriated Medidata's Trade Secrets

Under New York law, misappropriation occurs when a party obtains a trade secret "in

breach of an agreement, confidential relationship or duty, or as a result of discovery by improper

means."  *Faiveley Transp. Malmo AB*, 559 F.3d at 117.  Under the DTSA, the defendant

misappropriates a trade secret (1) when it acquires a trade secret by improper means, or (2)

discloses or uses the trade secret without consent.  *AUA Private Equity Partners, LLC*, 2018 WL

1684339 at *4 (citing 18 U.S.C. § 1839(5)).  "Improper means" under the DTSA can involve

"inducement of a breach of a duty to maintain secrecy," 18 U.S.C. § 1839(6)(A), including

contractual agreements not to disclose or disseminate information.  *Broker Genius*, 280 F. Supp.

3d at 511.

Medidata relies on direct evidence, circumstantial evidence and expert testimony to prove Veeva's misappropriation of the remaining Trade Secrets. Specifically, Medidata relies on direct evidence of: (1) documents retained by former Medidata employees and shared with Veeva; (2) emails sent by former Medidata employees at Veeva disclosing Trade Secrets and (3) conversations between Veeva supervisors and former Medidata employees involving the Trade Secrets.

Veeva claims these disclosures do not fall under the remaining Trade Secrets, citing evidence showing they are publicly available or too old to be valuable. Because a reasonable juror could find in support of either party on those questions, summary judgment is improper as to these disclosures.

Medidata also relies on circumstantial evidence, which may be used to prove misappropriation. As with other disputes on summary judgment, the relevant question is whether such evidence, construed in the light most favorable to the non-moving party, would allow a reasonable jury to conclude that misappropriation occurred. *See Electro-Miniatures Corp. v. Wendon Co.*, 771 F.2d 23, 26 (2d Cir. 1985); *accord Insurent Agency Corp. v. Hanover Ins. Co.*, No. 16 Civ. 3076, 2018 WL 3979589, at *3 (S.D.N.Y. Aug. 20, 2018).

Medidata generally (1) refers to hundreds of thousands of documents retained by former Medidata employees, "many" of which allegedly contain one or more Trade Secrets, (2) lists in one of its interrogatory responses hundreds or thousands of documents corresponding to each asserted Trade Secret and (3) alleges that various employees carried memories of numerous trade secrets to Veeva. In support of the inference that Trade Secrets in those documents were disclosed to Veeva by its employees, Medidata notes that Veeva entered the market soon after

acquiring Medidata employees and documents and that Veeva's products and business strategies are similar to Medidata's.  Medidata also cites its expert's analysis stating that Veeva developed a CTMS product more rapidly than expected.

Construing the evidence in the light most favorable to each party, a reasonable jury could or could not find that Veeva acquired, disclosed or used the Trade Secrets.  Summary judgment is not appropriate on this basis for either party.

### B.  The State Law Claims (Counts III to VI)

Veeva moves for summary judgment on Medidata's New York common-law claims of tortious interference with contractual relations (Count III), unfair competition (Count IV), aiding and abetting breach of fiduciary duties (Count V) and unjust enrichment (Count VI).  Veeva argues that these claims are governed by, and preempted under, California law.  Summary judgment is granted on the common law claims because they are expressly asserted under New York law, but under applicable choice-of-law principles, New York law does not apply.  If construed as brought under California law, which is the applicable state law, the claims are preempted.

Federal courts use the forum state's choice-of-law rule.  *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001); *accord Kashef v. BNP Paribas SA*, No. 16 Civ. 3228, 2020 WL 1047573, at *4 (S.D.N.Y. Mar. 3, 2020).  New York's choice-of-law rule first asks if an "actual conflict" is present and then which jurisdiction has a greater interest in the dispute.  *See AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 n.11 (2d Cir. 2018); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157-58 (2d Cir. 2012).  An actual conflict arises where the law of each jurisdiction "provides different substantive rules," and the differences are "relevant" and have a "significant possible effect on the outcome of the

trial," although they need not lead to different outcomes.  *Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin. Inc.*, 414 F.3d 325, 331–32 (2d Cir. 2005); *accord Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (summary order).

Here an "actual conflict" exists between New York and California law as to the viability of Medidata's common law claims.  New York law does not preempt non-contract claims arising from the same operative facts as a trade secret misappropriation claim, while California law does.  *Compare Sarkissian Mason, Inc. v. Enter. Holdings, Inc.*, 955 F. Supp. 2d 247, 254 (S.D.N.Y. 2013), *aff'd*, 572 F. App'x 19 (2d Cir. 2014), *with Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 888 (N.D. Cal. 2018).  Medidata does not dispute that Counts III through VI are preempted by California's Uniform Trade Secrets Act ("CUTSA") to the extent those claims rely on existence of the Trade Secrets.  *See K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 958 (2009) (holding that CUTSA preempts non-contract claims "that are based on the same nucleus of facts as the misappropriation of trade secrets claim for relief").  Because application of California law would preclude consideration of Counts III through VI, there is an actual difference between New York and California law as to these claims.  *See Fin. One*, 414 F.3d at 331–32.

The next question in the choice-of-law analysis is whether California or New York has a greater interest in the common-law claims of Counts III through VI.  "In trade secret cases the Second Circuit and its district courts have often used the locus of the misappropriation to determine the locus of the tort and the state with the greatest interest."  *Sarkissian*, 955 F. Supp. 2d at 254; *see also Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (applying New York law because "the misappropriation, if any, apparently took place in New York"); *Fedders Corp. v. Haier Am. Trading, LLC*, No. 00 Civ. 5583, 2002 WL 519733

(S.D.N.Y. Apr. 4, 2002) (applying Illinois law where actual misappropriation of trade secret took place); *Torah Soft Ltd. v. Drosnin*, 224 F.Supp.2d 704, 720 (S.D.N.Y. 2002) (applying Israeli law to "unfair competition" claims where all "acts" complained of took place in Israel).  Veeva is headquartered in California, the majority of the alleged misappropriation and related business decisions occurred in California and Medidata identifies no specific injuries that took place in New York.  On balance, California has the greater interest in this dispute, and California law governs the common law causes of action asserted in Counts III through VI.  Summary judgment for Veeva on Counts III through VI is granted to the extent those claims rest on trade secret misappropriation.

Medidata argues that the CUTSA does not displace non-contract claims that are independent of and based on facts distinct from the claims of trade secret misappropriation. While this is true, the principle does not apply here.  Medidata argues that two of its claims arise from facts independent of the trade secret claims -- that Veeva induced employees to violate their fiduciary duties to Medidata, and that Veeva was unjustly enriched independent of the Trade Secrets.  In support of the fiduciary duty claim, Medidata claims that "Veeva is liable on these claims for having induced [its] [f]ormer [e]mployees to violate their fiduciary duties to Medidata."  In support of that argument, Medidata refers to various allegations in its Second Amended Complaint relating to its former employees' theft of the Trade Secrets and other unspecified confidential information.  Medidata points to no evidence of such theft other than the previously discussed evidence relating to the Trade Secrets.  Because the fiduciary duty claim arises from the same facts as the misappropriation claims, the latter claims are preempted.

In support of its unjust enrichment claim, Medidata asserts that its "claim is not a carbon copy of its other claims" because "Medidata's trade secret claim requires a different showing

than its unjust enrichment claim."  Medidata cites New York law in support of this proposition but does not dispute that its unjust enrichment claim arises out of the same facts as its trade secret misappropriation claim.  The unjust enrichment claim is precluded under controlling California law.  *See K.C. Multimedia*, 171 Cal. App. 4th at 958.

### C.  The Affirmative Defenses

Medidata moves for summary judgment on Veeva's affirmative defenses of equitable estoppel and waiver, which Veeva raises in response to Medidata's claim that Veeva induced former Medidata employees to violate non-compete agreements by working for Veeva within one year of leaving Medidata.  Summary judgment is granted to Medidata on both of these defenses.

Veeva claims that Medidata waived its right to assert violations of the non-competition provisions in the employment contracts of former Medidata employees, and that Medidata is likewise equitably estopped from raising claims of violations of those non-compete provisions. "[W]aiver is the intentional relinquishment or abandonment of a known right."  *Conte v. Emmons*, 895 F.3d 168, 176 n.1 (2d Cir. 2018) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004)); *accord Beth Israel Med. Ctr. v Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 585 (2d Cir. 2006) ("The New York Court of Appeals has held that waiver of a contract right is the voluntary abandonment or relinquishment of a known contract right.  It is essentially a matter of intent which must be proved." (internal quotation marks omitted)).  Under New York and federal law, the party alleging equitable estoppel must demonstrate that (1) the estopped party knowingly concealed or made a misrepresentation; (2) intending or expecting that the moving party would rely on it and (3) the moving party detrimentally relied on that misrepresentation.  *See U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 136 (2d

Cir. 2014); *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013) (applying New York law, citing *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1269 (N.Y. 1982)).

In support of its waiver and estoppel arguments, Veeva cites evidence that various former Medidata employees informed Medidata that they were leaving for Veeva and that Medidata did not raise objections under the non-compete obligations of their employment contracts, in some instances explicitly acquiescing to their transfer. A reasonable juror evaluating this evidence in the light most favorable to Veeva could conclude that Medidata relinquished its right to object to the non-competition provisions in those employees' contracts. Medidata does not dispute this assertion but claims that any forgiveness of the non-compete provisions cannot implicate the confidentiality provisions in the employees' contracts. Veeva does not contest this point and does not identify any evidence from which a reasonable jury could conclude that Medidata intended to waive employees' confidentiality obligations simply because it did not seek to enforce non-competition obligations, or that Medidata intended such conduct to induce detrimental reliance on Veeva's part. Instead, Veeva provides evidence that Medidata often reminded employees of their confidentiality obligations when they left for Veeva. Absent a genuine dispute of material fact on this issue, and because the only claims to which violations of the non-competition provisions are applicable are preempted under California law, summary judgment is granted to Medidata on Veeva's affirmative defenses of waiver and equitable estoppel.

## IV.   CONCLUSION

For the reasons stated above, Medidata's motion is granted in part and denied in part, and Veeva's motion is granted in part and denied in part. Counts I and II survive solely as to the ten

classes of Trade Secrets for which Medidata offers sufficiently particular descriptions, as identified in Appendix A.  Counts III to VI are preempted under controlling California law. Medidata's motion for summary judgment on Veeva's affirmative defenses of waiver and equitable estoppel is granted.  Veeva's letter motion for oral argument is denied as moot.  The Clerk of Court is respectfully directed to close docket numbers 311, 327, 332 and 363.

Dated:  February 9, 2021
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

## Appendix A -- Trade Secrets

This Appendix identifies the Trade Secrets that are described with sufficient specificity for a juror to determine whether the elements of a cause of action for trade secret misappropriation are satisfied. This Appendix does not address whether the listed Trade Secrets were valuable, maintained secret or misappropriated.

## 1. The EDC Trade Secrets

a. Platform Design and Integration Concepts

The following Platform Design and Integration Concepts Trade Secrets are described with sufficient specificity:
  i. Software to integrate Rave EDC and [Medidata's] Coder product.
  ii. Integration technology to enable interoperability for the following Rave add-on software modules: "Business Objects," "Balance," "Batch Uploader," "Designer Gateway," "iMedidata," "J-Review," "Rave Data Exporter," "Script Utility," "Status Updater" and "Safety Gateway."
  iii. [REDACTED] messaging technology.
  iv. Platform design and integration technology enabling integration between the modules enumerated on the following diagram:

[REDACTED]

b. Software Architecture Design Processes and Principles

None.

c. Product Development Planning Strategies

The following Product Development Planning Strategies Trade Secrets are described with sufficient specificity:
  i. Updates to the Rave EDC user interface and role-specific dashboards.
  ii. Updates to the "Rave Architect" feature enabling Case Report Form design to be driven directly from the study protocol.
  iii. Enhanced data management functionality to improve data cleaning and reliance on custom functions and edit checks.
  iv. Conversion of frequently used custom functions to standard check actions in order to reduce study build times.
  v. Display of each Rave user's role information in the user interface.
  vi. The addition of role-based dashboards for improved navigation and ease of task completion in the EDC user interface.
  vii. "Quality by Design" tools for implementing operational strategies and workflows

for all phases of a clinical trial based on risk assessments.

viii. Configuration of trial randomization without resort to custom functions and transmittal of procedure completion information without the need for manual tagging.

ix. Improved speed and configurability for generating PDFs of end-of-study deliverables.

x. A click-through and sortable "Task Summary" in the EDC product.

xi. A configuration module allowing users to view data across multiple studies at the same time.

xii. Use of a common user interface across the CTMS and EDC products.

xiii. Drag-and-drop dashboard widgets.

xiv. A social networking feature facilitating communication between study participants and physicians.

xv. A language selection feature.

xvi. A feature providing integration with wearable devices.

xvii. Data management tools to enhance edit checks for outliers or poor calibration.

xviii. Image controls for viewing high-resolution images.

xix. A self-serve Rave option allowing users to purchase tools to build a study.

d. <u>Customer-Specific Product Development Information</u>

None.

e. <u>Product Development Implementation Information</u>

The following Product Development Implementation Information Trade Secrets are described with sufficient specificity:

i. Technology enabling integration between external systems and the Rave Data Explorer, Rave Status Explorer, SAS On Demand, Batch Uploader, Architect Loader and ODM Metadata Importer features of the EDC product.

ii. The use of a [REDACTED] for the EDC Product.

## 2. The CTMS Trade Secrets

a. <u>Platform Design and Integration Concepts</u>

None.

b. <u>Software Architecture Design Processes and Principles</u>

None.

c. <u>Product Development Planning Strategies</u>

The following Product Development Planning Strategies Trade Secrets are described with sufficient specificity:

31

i.  The following core functionalities of the CTMS product: (1) recording and tracking key study milestones across multiple studies; (2) forecasting of study milestone completion dates; (3) study planning and resource assignment across multiple countries; (4) tools for tracking forecasted and actual patient recruitment that are automatically populated from subject data in EDC acting as a "single source of truth"; (5) a module for authoring, reviewing, and publishing monitoring reports with online/offline capabilities; (6) user configurable monitoring report templates; (7) modules for tracking serious adverse events ("SAE") and deviations by subject; (8) automatic integration of the monitoring reports module with relevant information from the deviations, SAE, subject status, key subject event dates, query metrics, and CRF verification metrics, all from single-source-of-truth subject and CRF data in EDC using Medidata's proprietary Rave Web Services architecture; (9) a user-configurable clinical payments module for ad-hoc and automatic recording of financial transactions based on study activities and on-subject activities from EDC; and (10) a module for centralized, multi-site management of study findings and action items, allowing identification of trends across sites and protocols.

ii. The following add-on features to the CTMS product:  (1) audit trail exports via a user interface; (2) enhancing EDC-CTMS integration to maintain configuration alignment of subject visit schedules, including the implementation of incremental data pulls of template site data; (3) implementation of site and subject recruitment planning and internal staff assignments by country; (4) consolidation of user interface tools for managing site and study findings and visit report action items; (5) increasing the degree of configurability for visit report electronic signatures; (6) front-end access to set up configurable visit letters; (7) support for multi-day visits; (8) integration of CTMS with grants management and funds management tools; (9) procedure-based payments; (10) support for country-and region-specific taxes; (11) management of key CTMS functions, including milestone tracking at the country level; (12) configurable tools for importing and exporting key business data points in XML format; (13) introduction of standardized milestones using common terminology across all layers of a clinical study; (14) automatic roll-up and roll-down of standard statuses for clinical events at the study, country, site, and subject level; (15) multi-language visit letters; (16) platform-wide risk-based monitoring; (17) development of an integrated site management portal combining payments, surveys, SAE reporting, and document management; (18) out-of-the-box configurations for key templates, monitoring visit report questionnaires, pages fields, and drop-down lists for fast and efficient implementation of CTMS; (19) global split-payee set-up tools with built-in validation; (20) a pilot program for cloud-based database replication and migration services; (21) an enhanced standardized enrollment tracking dashboard; (22) improved logic for automatic calculation of projected study milestones; (23) a secure, compact offline client application designed for mobile study staff at locations without adequate Internet connectivity; (24) enhanced synchronization and conflict management procedures to support use of the offline client; (25) tools for global payment disbursement, global indirect tax and invoicing, cost approval, cost assignment, and cost reporting for sites; (26) faster multi-payee split cost setup with imports and cost validation and (27) enhancements to Rave EDC-CTMS integration, protocol deviations

standard reports, visit report e-signatures, site document tracking reports, and the XML importer tool.

    d.  <u>Customer-Specific Product Development Information</u>

None.

    e.  <u>Product Development Implementation Information</u>

The following Product Development Implementation Information Trade Secrets are described with sufficient specificity:

        i.  The use of [REDACTED] to avoid corruption of data due to multiple [REDACTED] on the same study.

       ii.  [REDACTED] export, import, and reporting processes into [REDACTED] in order to improve throughput and performance.

## 3.  The Business Trade Secrets

    a.  <u>Client Solutions Footprint</u>

The following Client Solutions Footprint Trade Secrets are described with sufficient specificity:

        i.  Information regarding contract renewal dates, life cycles and scope.

       ii.  Information regarding revenues on a product-by-product basis.

     iii.  Information regarding the particular Medidata products customers have purchased.

     iv.  Internal directories containing contact information for key individuals at current and prospective customers.

      v.  Sales information relating to Medidata's: (1) methodology used to analyze past performance; (2) current and anticipated sales opportunities; (3) three-step process for generating customer proposals; (4) sales quota information used to measure salesperson and organization performance and (5) value realization models used to calculate actual and potential client value derived from the EDC and CTMS products.

    b.  <u>Information Regarding Sales Activities</u>

The following Information Regarding Sales Activities Trade Secrets are described with sufficient specificity:

        i.  Win-loss analyses and supporting information showing successful and unsuccessful proposals in connection with different clinical trials.

       ii.  Data demonstrating potential earnings from active deals and potential new customers identified as likely sales opportunities.

     iii.  Medidata's proprietary sales process for generating customer proposals.

     iv.  Sales quotas by customer and salesperson.

      v.  Medidata's "value governance process," used to determine the effectiveness of its products for customers.

c. <u>Pricing Information</u>

The following Pricing Information Trade Secrets are described with sufficient specificity:
   i.   Medidata's proprietary pricing algorithm and formulae.
   ii.  The prices Medidata has proposed and actually charged to potential EDC and CTMS customers.

d. <u>Sales Team Training Materials</u>

The following Sales Team Training Materials Trade Secrets are described with sufficient specificity:
   i.   Materials used by Medidata to train salespeople to (1) articulate the value of its CTMS and EDC products, (2) present its solutions in the best light, (3) differentiate Medidata's position in the market and (4) map Medidata's solutions to the specific business needs of existing and potential customers.

e. <u>Overall Business Plans</u>

None.

f. <u>Go-to-Market Strategy</u>

The following Go-to-Market Strategy Trade Secrets are described with sufficient specificity:
   i.   Information regarding the size of the total potential market for the EDC and CTMS products by region and country.
   ii.  Medidata's process for assessing market factors and growth potential, and the data generated by that assessment.
   iii. Growth strategies by geographic region.
   iv.  Data regarding (1) lost proposals and bids, (2) customer feedback on product offerings or features and (3) market share.